Philip E. **LIAN**, Plaintiff,

v.

**SEDGWICK JAMES OF NEW YORK, INC., Sedgwick James of Connecticut, Inc., and Brian Innes, Defendants.**

No. 96 Civ. 5129(DC).

United States District Court,
S.D. New York.

Jan. 27, 1998.

---

Richard I. Wolff, New York City, for plaintiff.

Jackson, Lewis, Schnitzler & Krupman by Clifford R. Atlas, Uchente Ofiaja, New York City, for defendants.

## MEMORANDUM DECISION

CHIN, District Judge.

In this employment defamation case, plaintiff Philip E. Lian alleges that he was defamed when his supervisor sent an e-mail to other members of the department stating that the supervisor and plaintiff had agreed that plaintiff would begin seeking other employment. Plaintiff alleges that there was no such agreement. Yet, he promptly tendered his resignation. He then commenced this lawsuit for libel and intentional infliction of emotional distress, alleging that the e-mail was defamatory.

Defendants move for summary judgment. Because no reasonable jury could find that the e-mail was defamatory or that defendants' conduct exceeded all bounds of decency, defendants' motion is granted and the complaint is dismissed.

## BACKGROUND

Plaintiff is a licensed insurance agent who has been in the business of selling insurance since 1982. Defendants Sedgwick James of New York ("Sedgwick NY") and Sedgwick James of Connecticut ("Sedgwick CT") are, respectively, a New York corporation and a Connecticut corporation, both of which provide institutional insurance brokering services. Defendant Brian Innes was employed by Sedgwick CT as the Managing Director of Sales of the New York Metro Region Group.

Plaintiff was hired by Sedgwick NY in September of 1995. Initially, he worked as an insurance salesperson in the National Accounts Division. In January of 1996, he was reassigned to a newly-created marketing group, the New York Metro Region Group, where he continued to work as an insurance salesperson. At the time of plaintiff's reassignment, Richard Mitarotonda was the Managing Director of Sales and plaintiff's supervisor.

Innes replaced Mitarotonda as Managing Director of Sales of the New York Metro Region Group on April 15, 1996, becoming plaintiff's new supervisor. From the record, it is apparent that tensions developed between plaintiff and Innes almost immediately after Innes assumed his new position. The two met several times between mid-April 1996 and June 3, 1996, the date of plaintiff's resignation. It is undisputed that during these meetings, Innes repeatedly expressed concern about the manner in which plaintiff was handling certain transactions and other client matters. In particular, Innes complained that plaintiff was not following company procedure and that as a result, plaintiff's transactions were "fraught with E & O concern."[1] (Wolff Aff., Exh. 11, Innes Dep.

---

**1.** In the insurance industry, errors and omissions ("E&O") exposure refers to the liability or potential liability that an insurance agent may be sub-

at 173). The parties do disagree, however, on the substance of their discussions about plaintiff's continued employment with the company.

According to Innes, at an April 30, 1996 meeting, he suggested that plaintiff begin looking for other employment. At the conclusion of this meeting, Innes wrote a "Memo to File," in which he documented his concerns about "the manner in which [plaintiff was] representing our company, the type of business being generated using our name, . . . and the possibility of E & O exposure because procedures are not being followed." (Wolff Aff., Exh. 4). Innes testified at his deposition that he forwarded the memo to Ann McFadden, the director of Human Resources at Sedgwick NY, for placement in plaintiff's personnel file.

Plaintiff, on the other hand, contends that during the April 30, 1996 meeting, Innes never advised him to begin looking for work elsewhere. Rather, according to plaintiff, at that meeting, Innes merely told plaintiff that he wanted him to concentrate his efforts on his New York area business and to forego his established client base located outside of the New York area. Plaintiff purportedly told Innes that he had no objection to this "change of direction." (Wolff Aff., Exh. 10, Lian Dep. at 386-92). For purposes of this motion, I accept plaintiff's description of the meeting and I assume that he was not told at the meeting to begin looking for other work.

On May 3, 1996, during a telephone conversation with Innes, plaintiff claims to have reiterated his assent to limiting his business activity to New York area clients. Plaintiff maintains that during this telephone conversation, he expressed his desire to continue working at Sedgwick NY for at least the remainder of 1996. Plaintiff adamantly insists that at no time did Innes terminate his employment or seek his resignation. Again, I accept these allegations for purposes of this motion.

The events that followed the May 3, 1996 telephone conversation are not disputed. Later that afternoon, Innes distributed the following e-mail message to at least ten Sedgwick employees, including members of plaintiff's sales group and the head of Sedgwick NY's Human Resources department, Ann McFadden:

> I have today agreed with Phil Lian that he will begin to seek employment and opportunity outside of Sedgwick effective immediately. We have agreed that he may remain on the payroll for 60 days (including, not in addition to, any accrued vacation time) to effect this transition and to use his office on the 3rd floor only to arrange interviews, etc.
>
> Phil has agreed he is NOT to transact any further business in the name of Sedgwick. We have agreed to assist in the transition of business he has generated to his new employer, i.e. we will honor Letters of Appointment he may produce. These measures are necessary to protect our E&O exposure.
>
> We both hope the process will not take 60 days but have also agreed it will not take longer as far as Sedgwick is concerned— the end of June is the closure date we have agreed.
>
> Please effect the necessary measures from a personnel and security perspective and let me know if you have any questions. Thank you.

(Wolff Aff., Exh. 6). A few minutes later, Innes forwarded the same e-mail to Joan Ally, Group Executive Assistant to the New York Marketing Group, adding the following text: "For your information—please advise the team as appropriate." (*Id.*, Exh. 7). Then, approximately fifteen minutes later, Innes delivered the e-mail to Sedgwick NY Office Manager Terry Verderosa, copying Joan Ally and Ann McFadden, and added the following message: "For your information— please do not release the new code to the 3rd floor—Phil can ring to enter. Thanks." (*Id.*, Exh. 5).

Plaintiff maintains that the statements contained in the May 3, 1996 e-mail are false in all respects, in that he and Innes did not agree that he would seek employment elsewhere and that, in fact, Innes knew that plaintiff intended to remain at Sedgwick NY

---

jected to as a result of negligent acts or omissions in his professional conduct.

through at least the end of 1996. He claims that these allegedly false and defamatory statements "impugn [his] professional integrity and honesty and allege negligence, malpractice, misconduct, unfitness, dishonesty and/or fraud in connection with his professional actions and conduct and competence." (Compl.¶ 23). Several of the Sedgwick NY employees who received and read the e-mail transmission testified at their respective depositions that they did not construe the e-mail in the manner that plaintiff suggests. Nevertheless, plaintiff claims that due to the embarrassment he suffered as a result of the dissemination of this e-mail communication, he was forced to tender his resignation on June 3, 1996.

One week later, on June 10, 1996, plaintiff commenced this action for libel and intentional infliction of emotional distress in Supreme Court, New York County. His libel claim alleges that Innes's publication of the e-mail has "substantially and irreparably injured" his "excellent professional reputation for honesty, integrity and competence." (*Id.* ¶ 31). Additionally, plaintiff alleges that Innes intended to inflict extreme emotional distress by distributing the e-mail, and that, due to the damage to his professional career, he has suffered and will continue to suffer "extreme mental pain and anguish and emotional distress." (*Id.* ¶ 43). Plaintiff seeks compensatory and punitive damages.

Defendants removed the action to this Court on July 8, 1996, on the basis of diversity jurisdiction. Defendants now move for summary judgment on both claims, arguing that (1) the statements contained in the May 3, 1996 e-mail are not defamatory as a matter of law, (2) the statements contained in the May 3, 1996 e-mail are in any event subject to a "qualified privilege" and are therefore protected from a claim of defamation, and (3) plaintiff cannot make out a *prima facie* case of intentional infliction of emotional distress.

### DISCUSSION

#### A. *Standards for Summary Judgment*

The standards applicable to motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, *id.* 477 U.S. at 255 (citing *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)), there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

Once the moving party meets its initial burden of production, the burden shifts to the nonmoving party to demonstrate that there exist genuine issues of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* 475 U.S. at 586. There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson,* 477 U.S. at 249. As the Supreme Court stated in *Anderson,* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted). With these standards in mind, I now turn to defendants' motion for summary judgment.

#### B. *Analysis*

##### 1. *Defamation Claim*

Plaintiff's first cause of action for defamation is cast as a claim for libel. The sole basis for plaintiff's libel claim is the May 3, 1996 e-mail message distributed by Innes to various Sedgwick personnel announcing plaintiff's departure from the company. In short, plaintiff argues that the e-mail communication is defamatory because the statements contained therein falsely imply that he

was forced to resign from Sedgwick NY because he had caused the company to incur E & O exposure as a result of his professional negligence or malpractice. Plaintiff further contends that the statements constitute libel *per se* because they disparage his business reputation. Defendants counter that Innes's e-mail is incapable, as a matter of law, of the defamatory construction plaintiff gives to it.

 To make out a claim for libel under New York law, a plaintiff must show that the defendant wrongfully published to third persons a false and defamatory statement of and concerning the plaintiff that injured the plaintiff's reputation. *Levin v. McPhee,* 917 F.Supp. 230, 236 (S.D.N.Y.1996), *aff'd,* 119 F.3d 189 (2d Cir.1997). Normally, a plaintiff in a libel action must plead and prove special damages, *i.e.,* specific instances of pecuniary loss due to damage to his reputation. New York, however, "recognizes a limited category of statements to be libelous *per se* which do not require pleading and proof of special damages. Among these statements, it is well settled that 'a writing which tends to disparage a person in the way of his office, profession or trade' is libelous *per se.*" *Davis v. Ross,* 754 F.2d 80, 82 (2d Cir.1985) (quoting *Nichols v. Item Publishers,* 309 N.Y. 596, 601, 132 N.E.2d 860 (1956)); *accord Mullenmeister v. Snap–On Tools Corp.,* 587 F.Supp. 868, 871 (S.D.N.Y.1984) (stating that in New York, a libel plaintiff must plead and prove special damages unless the offending publication comprises libel *per se*).

 Before deciding whether particular words disparage an individual professionally so as to constitute libel *per se,* however, it must be determined whether the words are susceptible of only one meaning or of several meanings. *Davis,* 754 F.2d at 82. Such a determination is to be made by the court as a matter of law. *Id.* If the court determines that the words are susceptible of only one meaning, it then must determine, also as a matter of law, whether that one meaning is defamatory. *Id.; see also Aronson v. Wiersma,* 65 N.Y.2d 592, 493 N.Y.S.2d 1006, 1007, 483 N.E.2d 1138 (Ct.App.1985). In making these initial determinations, the court must "consider the publication as a whole," and not "pick out and isolate particular phrases." *James v. Gannett Co.,* 40 N.Y.2d 415, 386 N.Y.S.2d 871, 874, 353 N.E.2d 834 (Ct.App. 1976). The court is to "employ an objective standard and consider whether an ordinary person would find the statement 'reasonably susceptible of a defamatory connotation.'" *Davis,* 754 F.2d at 82 (quoting *James,* 386 N.Y.S.2d at 874, 353 N.E.2d 834). The court should not "strain to place a particular interpretation on the published words," *James,* 386 N.Y.S.2d at 874, 353 N.E.2d 834, nor "interpret [them] 'in their mildest and most inoffensive sense to hold them nonlibellous.'" *November v. Time Inc.,* 13 N.Y.2d 175, 244 N.Y.S.2d 309, 311, 194 N.E.2d 126 (Ct.App. 1963) (quoting *Mencher v. Chesley,* 297 N.Y. 94, 99, 75 N.E.2d 257 (1947)). Finally, the statement in question should "be 'read against the background of its issuance' with respect to 'the circumstances of its publication.'" *James,* 386 N.Y.S.2d at 874, 353 N.E.2d 834 (quoting *Mencher,* 297 N.Y. at 99, 75 N.E.2d 257).

 Bearing the above standards in mind, I conclude that the challenged e-mail communication in this case is reasonably susceptible of only one interpretation, and that such interpretation is not defamatory as a matter of law. Innes's May 3, 1996 e-mail merely announced the termination of plaintiff's employment at Sedgwick NY and instructed personnel and security to take the appropriate measures to prepare for plaintiff's departure from the company. The mere statement of discharge or termination from employment, even if untrue, does not constitute libel. *Davis,* 754 F.2d at 84; *see also Nichols,* 309 N.Y. at 601, 132 N.E.2d 860. "It is only when the publication contains an insinuation that the dismissal was for some misconduct that it becomes defamatory." *Nichols,* 309 N.Y. at 601, 132 N.E.2d 860.

Nothing, however, in the May 3, 1996 e-mail communication "reflects in any way on [plaintiff's] personal or professional integrity or ability," for no reason is cited for his termination, "such as incompetency, misconduct or any other behavior that could be said to disparage him personally or in his profession." *Nichols,* 309 N.Y. at 601, 132 N.E.2d

860. To the contrary, the e-mail suggests that the decision was a mutual one to which plaintiff "agreed." "[O]n the basis of any reasonable reading of the publication before [the court], it is impossible to conclude that it says or implies anything that could subject ... plaintiff[ ] to contempt or aversion, induce any unsavory opinion of [him] or reflect adversely upon [his] work." *Id.*

At worst, the second paragraph of the e-mail can be construed as an expression of concern that, because plaintiff no longer worked for Sedgwick NY, any business he transacted in the company's name after the termination of his employment might subject the company to E&O liability. Similarly, the statement directing Verderosa not to release to plaintiff the new security code to the third floor simply reflects implementation of Sedgwick's policy of restricting terminated employees' access to company premises and client files. (*See* Wolff Aff., Exh. 11, Innes Dep. at 330–31; Atlas Moving Aff., Exh. G, Verderosa Dep. at 34). "[C]onsider[ing] the publication as a whole," *see James,* 386 N.Y.S.2d at 874, 353 N.E.2d 834, the "average reader," *see Aronson v. Wiersma,* 493 N.Y.S.2d at 1007, 483 N.E.2d 1138, certainly would not attribute a defamatory meaning to the May 3, 1996 e-mail. Indeed, no reasonable person could conclude that the e-mail is defamatory on its face.[2]

Plaintiff argues that when the e-mail is considered in light of the animosity that existed between plaintiff and Innes and in conjunction with Innes's concessions that he (1) sought plaintiff's resignation because he believed that plaintiff had exposed Sedgwick NY to E&O liability and (2) instructed him not to transact any further business to protect Sedgwick NY from such exposure, the e-mail is susceptible of an alternative interpretation that is defamatory. The "clear and unambiguous language" of the May 3, 1996 e-mail communication, plaintiff contends, demonstrates that Innes meant to say, and was understood by many Sedgwick employees to have meant,

> (i) that Lian had agreed to leave his employment with Sedgwick NY "effective immediately," because he had caused Sedgwick NY to have "E&O exposure" as the result of his professional negligence or malpractice and/or because he had done something of a dishonest or fraudulent nature; (ii) that Lian as a result of his professional negligence or malpractice had agreed "NOT to transact any further business in the name of Sedgwick" in order to "protect our E&O exposure"; and (iii) that Lian because of his dishonesty or fraudulent nature could not be trusted with the "new code" for the third floor where he worked so he could come and go as he pleased ... without constant supervision and that various other "security" measures had to be taken to protect the property of Sedgwick NY from theft or misuse by Lian.

(Compl. ¶ 24).

■ Plaintiff completely distorts the statements contained in the May 3, 1996 e-mail message and attributes to them an interpretation that is wholly untenable. Plaintiff's interpretation requires consideration of extrinsic facts concerning Innes's subjective view of plaintiff's professional conduct. Even assuming that these extrinsic facts are true, however, plaintiff must prove that someone other than he and Innes was aware of their existence. Without knowledge of the extrinsic facts that ostensibly render a statement libelous *per se*, the third parties to whom the statement is published cannot consider them

---

**2.** Not surprisingly, plaintiff testified at his deposition that the colleagues with whom he spoke in the days after the distribution of the May 3, 1996 e-mail told him that their understanding of the e-mail was consistent with his defamatory interpretation. (*See* Wolff Aff., Exh. 10, Lian Dep. at 460–61, 484–85, 490–91, 499, 510). The testimony of the witnesses themselves, however, directly contradicts plaintiff's testimony. Plaintiff's colleagues at Sedgwick NY who read the e-mail testified unequivocally that they did not understand it in the disparaging manner that plaintiff suggests, as their deposition excerpts make clear. (*See* Atlas Reply Aff., Exh. C, Verderosa Dep. at 19–27, 34; *Id.,* Exh. D, Ally Dep. at 31, 64; Atlas Moving Aff., Exh. J, McFadden Dep. at 115–16; *Id.,* Exh. I, Fuller Dep. at 110–13; *Id.,* Exh. K, McGinty Dep. at 142–43). While this discrepancy in testimony arguably creates an issue of fact, it is not material to the outcome of the case because I hold the e-mail to be non-defamatory as a matter of law. Hence, summary judgment in defendants' favor is not precluded. *See* Fed. R.Civ.P. 56(c).

and, hence, have no basis for attributing to the statement a defamatory meaning. *See Van–Go Transport Co. v. New York City Bd. of Ed.,* 971 F.Supp. 90, 98–99 (E.D.N.Y.1997) (stating that a "statement may be shown to be libelous *per se* by pleading extrinsic facts that are '*presumably known*' to the readers of the statement") (emphasis added) (quoting *Hinsdale v. Orange County Publications, Inc.,* 17 N.Y.2d 284, 270 N.Y.S.2d 592, 597, 217 N.E.2d 650 (Ct.App.1966)); *Alvarado v. K–III Magazine Corp.,* 203 A.D.2d 135, 610 N.Y.S.2d 241, 243 (1st Dep't 1994) (holding that photo accompanying magazine article depicting plaintiffs as underage drinkers was not libelous on its face because "plaintiffs' ages [were] not stated or otherwise apparent in the article" and therefore such information constituted extrinsic fact not "presumably known to its readers").

Plaintiff has failed to offer any such proof. The only person who might have been aware of Innes's concerns about plaintiff's performance prior to the dissemination of the May 3, 1996 e-mail was Ann McFadden. Innes and McFadden both testified that Innes had distributed a copy of the April 30, 1996 "Memo to File" to McFadden because she was head of personnel and therefore maintained plaintiff's personnel file. (*See* Wolff Aff., Exh. 11, Innes Dep. at 287; *Id.,* Exh. 12, McFadden Dep. at 106). McFadden further testified, however, that she did not understand the e-mail to have the defamatory connotation that plaintiff suggests. (*See id.,* Exh. 12, McFadden Dep. at 115–16). Moreover, McFadden testified that she never showed the memo to anyone else, nor discussed it with anyone else. (*See id.,* Exh. 12, McFadden Dep. at 106). Plaintiff has simply offered no evidence from which a reasonable jury could find that a third party who read the e-mail transmission knew of the extrinsic facts that plaintiff claims render the e-mail defamatory, *and* that such third party actually understood the statements contained therein to be disparaging of plaintiff's business reputation.

In sum, I conclude that plaintiff has failed to present evidence from which a reasonable jury could find that Innes's May 3, 1996 e-mail transmission was libelous *per se*, thereby injuring plaintiff's business or professional reputation. Accordingly, defendants' motion for summary judgment dismissing the defamation claim is granted.[3]

**2. Claim for Intentional Infliction of Emotional Distress**

For his second cause of action, plaintiff claims that by publishing the allegedly false and defamatory e-mail, Innes intended to inflict on him severe emotional distress. Dismissal of this claim, too, is warranted on several independent grounds.

First, "New York's courts have rejected claims of intentional infliction of emotional distress 'where the conduct complained of falls well within the ambit of other traditional tort liability.'" *Levin v. McPhee,* 917 F.Supp. 230, 242 (S.D.N.Y.1996) (quoting *Fischer v. Maloney,* 43 N.Y.2d 553, 402 N.Y.S.2d 991, 993, 373 N.E.2d 1215 (Ct.App. 1978)), *aff'd,* 119 F.3d 189 (2d Cir.1997). Plaintiff's claim for intentional infliction of emotional distress based on defendants' alleged publication of a libel is "duplicative" and is therefore, as New York courts have repeatedly held, "more properly addressed within the context of a libel suit." *Id.; see, e.g., Sweeney v. Prisoners' Legal Servs. of New York, Inc.,* 146 A.D.2d 1, 538 N.Y.S.2d 370, 374 (3d Dep't 1989); *Manno v. Hembrooke,* 120 A.D.2d 818, 501 N.Y.S.2d 933, 936 (3d Dep't 1986).

Furthermore, the basis for plaintiff's claim for intentional infliction of emotional distress is that he was forced to resign from the company sooner than he intended due to the embarrassment he experienced as a result of the dissemination of the e-mail. Such a claim is in essence a claim for constructive abusive or wrongful discharge. The New York Court of Appeals has held, however, that there is no cause of action in tort in New York for abusive or wrongful discharge of an

---

**3.** Both parties also address the issue of whether the e-mail is protected by a qualified privilege. In light of my holding that the challenged e-mail communication is not defamatory as a matter of law, consideration of this issue is unnecessary.

at-will employee. *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 235, 448 N.E.2d 86 (Ct.App. 1983). Accordingly, "plaintiff should not be allowed to evade that conclusion or to subvert the traditional at-will contract rule by casting his cause of action in terms of a tort of intentional infliction of emotional distress." *Id.; accord Tischmann v. ITT/Sheraton Corp.*, 882 F.Supp. 1358, 1367–68 (S.D.N.Y. 1995)

Finally, defendants correctly assert that the conduct alleged by plaintiff fails to meet the stringent standard New York courts apply to determine whether conduct amounts to intentional infliction of emotional distress. To prevail on a claim for intentional infliction of emotional distress under New York law, a plaintiff must prove the following elements: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir.1996). New York courts strictly apply this test and require the conduct alleged to be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir.1985) (quoting *Fischer*, 402 N.Y.S.2d at 993).

Even assuming that all of plaintiff's factual allegations are true, and resolving all ambiguities and drawing all inferences in plaintiff's favor, defendant's alleged conduct fails to satisfy New York's stringent requirements. As discussed above, by disseminating the May 3, 1996 e-mail, Innes merely informed a select group of Sedgwick NY personnel of the termination of plaintiff's employment, and the text of the e-mail is otherwise benign. Even assuming that plaintiff had not agreed to begin to seek other employment and that Innes was unilaterally terminating plaintiff's employment, which was his prerogative, as plaintiff was an "at-will" employee whose employment could be terminated at any time for any lawful reason, no reasonable jury could conclude that Innes's conduct was "outrageous," "atrocious," or "intolerable." Accordingly, defendants' motion for summary judgment dismissing the intentional infliction of emotional distress claim is also granted.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted in its entirety. The Clerk of the Court shall enter judgment in favor of defendants dismissing the complaint with prejudice.

SO ORDERED.