John L. KAREDES, Plaintiff,

v.

THE VILLAGE OF ENDICOTT; Michael Colella, in his capacity as Mayor of the Village of Endicott and in his individual capacity; Binghamton Press Company, Division of Gannett Satellite Information Network, Inc.; Gannett Company, Inc.; WIVT Newschannel 34; WBGH Newschannel 5; and the Ackerley Group, Inc., Defendants.

No. 3:01–CV–1395(FJS/GLS).

United States District Court,
N.D. New York.

March 31, 2003.

High, Swartz, Roberts & Seidel, LLP, Norristown, PA, for Plaintiff John A. Gallagher, Esq.

Office of Theo J. Totolis, Endicott, for Plaintiff Theo J. Totolis, Esq.

Holland & Knight LLP, Washington, D.C. for Defendants Binghamton Press Company, a Division of Gannett Satellite Information Network, Inc. and Gannett Company, Inc., Charles D. Tobin, Esq., Kara L. Daniels.

Pearis, Resseguie, Kline & Barber, LLP, Binghamton, for Defendants Binghamton Press Company, a Division of Gannett Satellite Information Network, Inc. and Gannett Company, Inc., Stuart M. Pearis, Esq., of Counsel.

## MEMORANDUM–DECISION AND ORDER

SCULLIN, Chief Judge.

## I. INTRODUCTION

Plaintiff's amended complaint includes eight causes of action, alleging violations of Plaintiff's First and Fourteenth Amendment rights pursuant to § 1983 and state law claims of breach of contract, interference with contract, *prima facie* tort, libel and defamation. Only Plaintiff's seventh cause of action, which is a state law libel claim, is asserted against Defendants Binghamton Press Company, a Division of Gannett Satellite Information Network, Inc. and Gannet Company, Inc. (collectively *"Press & Sun–Bulletin"*).

## II. BACKGROUND

### A. Events leading up to the *Press & Sun–Bulletin* articles

The Village of Endicott (the "Village") owns and operates for profit the En–Joie Golf Club ("En–Joie"), consisting of an 18–hole golf course, a pro shop and a restaurant. *See* Amended Complaint at ¶¶ 33–34. Each year, En–Joie hosts the B.C. Open, a PGA Tour event that the Broome County Community Charities, Inc. ("BCCC") operates. *See id.* at ¶¶ 36–37.

In March 1996, the Village Board of Trustees ("Trustees") executed a management-consulting agreement with Plaintiff, under which he managed the golf course.[1] *See id.* at ¶¶ 43, 48. Under that agreement, Plaintiff was responsible for:

(a) preparation of the facilities annual budget following guidelines set forth by the Mayor and Board of Trustees;

(b) preparation of all bills, payroll and accounts payable to be submitted to the Village Treasurer's Office for approval and payment;

(c) scheduling of all staff work schedules and schedules for all tournament play at the facility;

(d) scheduling tournament play and outings at the facilities;

---

1. The pro shop and restaurant were managed under a separate agreement and were not Plaintiff's responsibility.

(e) bookkeeping of all revenue of the facility;

(f) advising the Village with respect to the selection, maintenance and replacement of equipment related to the facility;

(g) recommending the hiring and firing of all personnel and staff at the facility; and

(h) training and management of all staff at the facility.

*See id.* at ¶ 53 and Exhibit "A." [2]

Throughout his tenure, Plaintiff reported directly to the Mayor and the Trustees. *See id.* at ¶¶ 176–182. In memoranda he co-signed with the golf course superintendent, Plaintiff submitted the Golf Department's monthly reports on expenditures and revenues. *See id.* at ¶¶ 178–179 and Exhibits "H" and "I." Plaintiff also served on the Mayor's Golf Course Advisory Committee. *See id.* at Exhibit "G."

In September 1995, the BCCC requested, and the Village leadership approved, renovations of the golf course that the PGA Tour had requested. *See* Amended Complaint at ¶ 76. The BCCC agreed to pay nearly all expenditures associated with the renovations. *See id.* at Exhibit "M" at 20. Concurrently, the Village authorized another set of renovations to be paid at its expense. *See id.* at ¶ 110. During the renovations, the Village Clerk–Treasurer executed checks in response to invoices from third-party contractors and suppliers. *See id.* at ¶ 181. Before those payments were made, Plaintiff reviewed and approved the invoices. *See id.* at ¶ 53 and Exhibit "M" at 26.

In fiscal years 1996–1999, during which the renovations were made, the expenditures for the golf course exceeded the budgeted expenditures and its revenues fell below the budgeted revenues. Overall, the golf course operation expenditures during that time period exceeded golf course revenues by more than $2 million. *See id.* at Exhibit "M," auditor's letter of August 28, 2000, at 1.

In February 2000, under Mayor Colella's direction, a reconfigured Golf Advisory Committee issued an initial report entitled "John Karedes' Budget Information." *See* Amended Complaint at ¶¶ 210, 215. The report stated that during 1997 through 1999, the Golf Department spent more than $1 million over the budget. *See id.* at ¶ 215. Mayor Colella criticized Plaintiff and argued for a full-scale, private audit. *See id.* at ¶¶ 218–219. The Trustees agreed. *See id.* at ¶ 233.

At a February 12, 2001 Trustees meeting, which was open to the public, the independent auditors released the results of the audit: "Village of Endicott, New York, General Fund–Golf Department, Audit Report For the Four Years Ended May 31, 1999." *See id.* at ¶ 328. According to the audit, the Trustees tasked the auditors with examining "golf course operations" for the period July 1, 1995 through May 31, 1999, including the propriety of golf course expenditures, the existence of internal controls for the procurement system, whether any other organization may owe the Village for expenditures made on the organization's behalf, and the reasons and responsibility for the budget overruns. *See id.* at Exhibit "M" at 41–44.

The audit identified many problems with the Village's management of golf-course resources that contributed to a four-year, $1.1 million overrun of budgeted Golf Department expenditures. *See id.* at Exhibit "M" at 17. The auditors concluded that the "Village paid three vendors over

---

**2.** In March 1997, the Village and Plaintiff renewed this agreement for an additional

three years. *See* Amended Complaint at ¶ 52.

$153,000 for invoices billed to [the BCCC]" and also paid other invoices totaling $7,611 that were addressed to the BCCC or the B.C. Open. *See id.* at Exhibit "M" at 25–36. The auditors also found that Plaintiff, whom they referred to as the "Golf Department Management Consultant" had exceeded the scope of his consulting agreement by approving substantially all expenditures during the audit period and by approving and submitting employee time sheets. *See id.* at Exhibit "M" at 27, 36. As a result of these deficiencies, the auditors reported that "the Village may have paid for goods and services, which were not received or received in an unacceptable condition or not related to golf department operations". *See id.* at Exhibit "M" at 29.

At the February 12, 2001 Trustees meeting, Kenneth Coleman, a representative of the auditing firm fielded Trustees' questions about the audit. *See* Amended Complaint at ¶¶ 335–338. According to Plaintiff, when asked to rate the golf course's business procedures and accountability, Mr. Coleman responded:

> Well, for the Village as a whole, in terms of the golf department, and now I'm going to encompass everything, all of the things that I have talked about, which encompasses a great deal more perhaps than that question really raises, but I would say that I have never ever in 30 years of doing work both in private and in the governmental environment seen record keeping as poor as this.

*See id.* at ¶ 337.

With respect to the audit's findings regarding invoices that the Village paid but were billed to BCCC, Mr. Coleman told the Trustees:

> I said that those bills were invoiced to and addressed to somebody else. . . . But I did not say that those bills were necessarily somebody else's bills, and I don't want to leave anybody with the impression that we've come to that con-

clusion. . . . We are not in a position to pass judgment one way or the other on that, but the record to us is clear that those bills are not in the name of the Village and therefore we have treated them as a question of costs.

*See id.*

## B. The *Press & Sun–Bulletin* articles

On February 13, 2001, February 25, 2001, and March 8, 2001, the *Press & Sun–Bulletin* reported on the audit and the February 12, 2001 Trustees' meeting. *See* Amended Complaint at Exhibits "O," "P," and "Q."

### 1. The February 13, 2001 article

The February 13, 2001 article is captioned "Audit blasts En–Joie bookkeeping." *See id.* at Exhibit "O." The article reported that the audit of the "En–Joie Golf Club was sharply critical . . . of the club's bookkeeping." *See id.* The article also quoted Mr. Coleman as saying, "Never, ever in 30 years (as an accountant) have I seen record-keeping as poor as En–Joie's[.]" *See id.* The article also noted that Mr. Coleman had stated that "no one person is to blame for the bookkeeping nightmare. . . . [I]t was a failure of the club's—and the village's—internal control systems. 'No one ever addressed these problems as they came up.'" *See id.* The article also mentioned that Mr. Coleman had said that "[w]hen the invoices were examined, . . . auditors found $151,000 in bills from three vendors that were addressed to another entity [BCCC] but paid by the village." *See id.* The article only mentioned Plaintiff once, noting that

> En–Joie Manager John L. Karedes said late Monday night that he did not think it would be fair to comment on the audit until he has a chance to read the final report. Karedes said he read the preliminary audit two weeks ago, but

doesn't know what might be different in the final version. He has managed the club since March 29, 1996. *See id.*

Finally, the article noted that certain former and current Trustees criticized the audit, believing that Mayor Colella had engaged in a long-running battle against the golf course operator and had improperly influenced the audit's findings. *See id.*

### 2. The February 25, 2001 article

The February 25, 2001 article is entitled "Taxpayers footed B.C. Open bills." *See* Amended Complaint at Exhibit "P." The article begins by noting that before major renovations began, "the architects of a major overhaul of Endicott's En–Joie Golf Club's course pledged that their plans to mold it into a world-class course would not cost taxpayers a dime." *See id.* The article then noted that

> Now auditors estimate the village shouldered more than $170,000 of the cost. It paid to rent backhoes and plant grass. It signed checks to contractors who were pouring concrete and others who were delivering gravel, even though many of the bills were addressed to [BCCC], which runs the B.C. Open and had agreed to fund the work.
>
> Why Endicott paid the bills is unclear. Former officials say the payments were authorized by village lawmakers; others insist they should never have been paid in the first place. The village's records are so sloppy that neither side can say for certain which of them is right.

*See id.*

The article then noted Plaintiff's involvement in these events:

> [H]ow the village paid bills addressed to someone else is no mystery. John Karedes, who has a management consultant agreement with the village to run its golf course, signed voucher after

voucher that effectively passed the cost on to taxpayers. Two of the bills he signed away were addressed to the man who runs [BCCC], Alex Alexander.
>
> In the last two years alone, Karedes signed more than a dozen vouchers that prompted the village to pay at least $151,676.47 worth of bills addressed to the B.C. Open, a review of Endicott's financial records shows.
>
> Village officials had countless chances to step in and stop the bills from being paid. But a stack of cashed checks and signed invoices shows that they didn't.

*See id.*

In the next paragraph, the article quoted Plaintiff as stating, " 'Could it have been done better? There were obviously some system problems, and I'm sure improvements could be made[.]' ... 'But those are system problems. It's not just me and it's not just the golf course.' " *See id.*

The article then noted that the *Press & Sun–Bulletin* had "examined dozens of bills, vouchers and checks that were singled out by accountants at the [auditing] firm ...." *See id.* After stating that the audit had "detailed widespread financial problems at En–Joie and inside Endicott's government[,] the article noted that

> [t]he auditors found the golf course's finances in chaos. Cash was not handled appropriately, and the village never sought competitive bids for expensive construction projects, even though state law requires bids for expensive construction projects, even though state law requires bids for any work that costs more than $20,000. En–Joie went over budget four years in a row, and between 1996 and 1999, it lost roughly $2 million, though not all of the losses were unexpected".

*See id.*

Once again highlighting Plaintiff's role in these events, the article noted that

What the audit does not say is that the common thread among many of what it called the golf course's most serious problems is Karedes' signature. He is the one who asked the village to pay bills addressed to the B.C. Open and never sought bids to keep the cost down, records show.

On one day in May 1999, for example, Karedes signed away more than $35,000 in bills addressed to the B.C. Open. One of the bills, submitted by Frazier's Landscapes Inc., of Otego, was for excavating the 18th fairway—work [BCCC] promised to do with its own money when it inked its deal to buff the En–Joie Golf Course into the kind of place that could host Professional Golfers Association tournaments in 1996.

That month, Karedes passed along almost $70,000 in bills addressed to the B.C. Open....

\* \* \* \* \* \*

But in late May and early June of 1998, Karedes signed $27,000 worth of bills from Broome Bituminous Products Inc., with Alexander's [head of BCCC] name on them. Village tax payers paid those bills, too.

Taxpayers paid again in June 1999, when in one day, Karedes signed a pair of B.C. Open bills that totaled more than $30,000. One of those bills—a $12,000 invoice from Frazier's Landscapes—was for seeding grass, work auditors said should have been paid for by [BCCC]. But again, village taxpayers were left to pick up the tab.

*See id.*

After explaining Karedes' role, the article addressed the breakdown in the Village's offices:

Village officials had the power to step in and stop those payments at almost any time. The clerk-treasurer at the time, Donna Kilbury, was supposed to review the vouchers and invoices before the village ever signed a check. The village's Board of Trustees had to approve the checks before they were mailed.

But that process of review—which is meant to guard taxpayers against having their money spent improperly—broke down at almost every turn, [the] auditors concluded. After months of reviewing Endicott's books, the auditors found that the village 'did not have an adequate system of internal control,' according to their report.

*See id.*

With respect to the issue of competitive bidding, the article reported that at En–Joie competitive bidding was not done. The article quoted Plaintiff as stating, " 'I didn't know the policy,' ... 'Besides, when you're in a situation where the contractor is already there and has the equipment 10 feet away ... it was just a fit and connect rather than bringing someone else in and piecemealing it and having the course look like a patchwork quilt.' " *See id.* The article went on to explain,

So in 1998, Karedes authorized the village to pay a total of $41,814.68 to Broome Bituminous Products, a Vestal construction firm, without ever asking another company to quote a price records show. By law, payments half the size have to be put out to bid to make sure taxpayers get a fair price.

The next year, Karedes approved $45,903 in payments to Frazier's Landscapes and $50,499.19 in payments to Dellapenna Brothers Inc., a Johnson City company that poured concrete at the golf course.

Each of those invoices was addressed to the B.C. Open. Some of them were mailed to a post office box in Endicott that belongs to [BCCC], to which Karedes did not have access, Alexander said.

The Board of Trustees, which ultimately had to sign off on all the payments, never questioned the lack of competitive bidding.

*See id.*

The article also noted that

Karedes would not discuss the specifics of the invoices he signed over to the village. But he said much of the work he agreed to pay for was done at the behest of village officials, including former Mayor David Archer, who viewed [BCCC]'s work on the golf course as a good opportunity to finish some of the village's own sought-after renovations.

Karedes said it is possible that the contractors, all of whom also were doing work for [BCCC], addressed invoices meant for the village to the B.C. Open by mistake.

*See id.*

The article also reported that

If there were questions about bills he signed, Karedes said, they should have been brought to him by Kilbury, whose job it was to review the vouchers and invoices he billed to the village. All of the payments had to be approved by Kilbury's department and by the Board of Trustees before the village put a check in the mail.

"No checks were written by me," Karedes said. "I followed the procedures that were given to me in 1996. If I knew a bill was the village's, that's what I paid. We looked at the job description to see who the work should have been charged to."

He admitted, though, that he never asked Endicott's attorney or anyone else in the Municipal Building to clarify what work, if any, he should pay for and what work had to be funded by [BCCC] under its 1996 contract with the village.

"It's a lot easier to go back in hindsight and say would've, could've, should've," Karedes said, adding that he

is working to put tighter controls on En–Joie's finances.

Neither the Board of Trustees nor Kilbury asked the lawyer for clarification either.

"Every bill, I called John Karedes and checked to see that it was ours," Kilbury, the former clerk-treasurer, said. "The project that was going on down there was so overlapping between the village and BCCC. He explained in each case that these were our responsibility."

No members of the board questioned the bills because "we assumed that the mayor and everyone else knew what they were doing," Fiori–Gazda said.

*See id.*

The article ended with a comment by former mayor Archer who acknowledged that the invoices addressed to the B.C. Open were troubling and hinted at deeper problems with the way the Village handled its money. *See id.* Archer noted, " 'We knew then we needed a new accounting system[.]' . ' . .'You can see it as a people problem or as a process problem. I see it as a process problem and it can be improved.' " *See id.*

### 3. *The March 8, 2001 article*

The March 8, 2001 article is entitled "CPAs don't fault auditors for not visiting En–Joie." *See* Amended Complaint at Exhibit "Q." The article begins by noting that

[i]n the weeks following the release of an audit that led to his firing, En–Joie Golf Club Manager John L. Karedes has asked why the auditing firm didn't visit the club to take a look at its daily operation.

Karedes was trying to cast doubts on the findings of the Piaker & Lyons audit

that criticized the bookkeeping at the club and in the village treasurer's office. *See id.*

The article reported that two Broome County certified public accountants had stated that "Karedes may or may not have a legitimate question." *See id.* The article also quoted Jeffrey Goldberger, a CPA and lecturer at Binghamton University, as stating that "[w]hen an audit focuses on financial statements and the underlying records, there is little reason to go to the facility[.]" *See id.* The article then noted that

[a]fter looking at En–Joie's books, Coleman said, they were in such disarray that he refrained from issuing a professional opinion as to whether or not the financial statements offered a clear picture of the club's true financial condition.

*See id.*

Finally, the article noted that Mr. Goldberger said that

personal tensions in the En–Joie audit may have "fettered free communications during the audit."

Now, ... after the audit has been released, the major players—particularly Mayor Michael E. Colella and Karedes—are trying to justify what they have done.

*See id.*

Presently before the Court is the *Press & Sun–Bulletin*'s motion, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the seventh cause of action, which purports to state a claim for libel based upon the contents of the above-quoted articles. The Court heard oral argument in support of, and in opposition to, this motion on February 11, 2002, and reserved decision. The following constitutes the Court's written determination of the pending motion.

## III. DISCUSSION

### A. Standard of review

In considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court's function is limited to testing the legal sufficiency of the complaint. *See Sileo v. Principal Life Ins. Co.*, No. 00–CV–1239, 2001 WL 366422, *1 (N.D.N.Y. Apr.10, 2001) (citation omitted). A court will dismiss a complaint for failure to state a claim " 'only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' " *Id.* at *2 (quoting *Tarshis v. Riese Org.*, 211 F.3d 30, 35 (2d Cir.2000) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957))).

In ruling on the merits of a motion to dismiss, the court's " 'consideration is limited to the factual allegations in [the] complaint, which are accepted as true, [and] to documents attached to the complaint as an exhibit or incorporated in it by reference, ...' " *Isanaka v. Spectrum Techs. USA Inc.*, 131 F.Supp.2d 353, 357 (N.D.N.Y. 2001) (quoting *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)). A complaint "which consists of bald assertions and conclusory allegations unsupported by factual assertions 'will not suffice to state a claim.' " *Sileo*, 2001 WL 366422, at *2 (quoting *Tarshis*, 211 F.3d at 35; *DeJesus*, 87 F.3d at 70).

### B. The elements of a defamation claim under New York law

"The New York Court of Appeals has defined a defamatory statement as one that exposes an individual 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or ... induce[s] an evil opinion of one in the minds of right-thinking persons, and ... deprives one of ... confidence and friendly intercourse in

society.'" *Celle v. Filipino Reporter Enters. Inc.,* 209 F.3d 163, 177 (2d Cir.2000) (quoting *Kimmerle v. New York Evening Journal,* 262 N.Y. 99, 186 N.E. 217, 218 (1933)) (other citation omitted).

◼ To prevail on a claim of defamation/libel, a plaintiff who is a public figure must show that the statements about which he complains were "(1) of and concerning [Plaintiff], (2) likely to be understood as defamatory by the ordinary person, (3) false, and (4) published with actual malice, that is, either knowledge of falsity or reckless disregard of the truth." *Church of Scientology Int'l v. Behar,* 238 F.3d 168, 173 (2d Cir.2001) (citation omitted).[3]

◼ In determining whether the statements complained of are defamatory, the court must "'consider the publication as a whole,' and not 'pick out and isolate particular phrases.'" *Lian v. Sedgwick James of N.Y., Inc.,* 992 F.Supp. 644, 649 (S.D.N.Y.1998) (quoting *James v. Gannett Co.,* 40 N.Y.2d 415, 386 N.Y.S.2d 871, 874, 353 N.E.2d 834 (Ct.App.1976)). The court must "'employ an objective standard and consider whether an ordinary person would find the statement "reasonably susceptible of a defamatory connotation."'" *Id.* (quoting *Davis,* 754 F.2d at 82 (quoting *James,* 386 N.Y.S.2d at 874, 353 N.E.2d 834)). Moreover, "[t]he court should not 'strain to place a particular interpretation on the published words,' *James,* 386 N.Y.S.2d at 874, 353 N.E.2d 834, nor 'interpret [them] "in their mildest and most inoffensive sense to hold them nonlibellous."'" *Id.* (quoting *November v. Time Inc.,* 13 N.Y.2d 175, 244 N.Y.S.2d 309, 311, 194 N.E.2d 126 (Ct.App.1963) (quoting *Mencher v. Chesley,* 297 N.Y. 94, 99, 75 N.E.2d 257 (1947))). Truth, of course, provides a complete defense to a claim of defamation. *See Dillon v. City of N.Y.,* 261 A.D.2d 34, 39, 704 N.Y.S.2d 1 (1st Dep't 1999) (citations omitted).

◼ With respect to the "actual malice" element of a defamation claim, a public plaintiff must demonstrate that the allegedly libelous statement "was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The plaintiff must make this showing by clear and convincing evidence. *See Church of Scientology Int'l,* 238 F.3d at 174 (citing *Celle,* 209 F.3d at 183). "[T]he actual malice standard does not measure malice in the sense of ill will or animosity, but instead the speaker's subjective doubts about the truth of the publication." *Id.* (citing *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 510, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) ("Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will.")).

◼ If the plaintiff is unable to show that the defendant knew that the statements were false, then the plaintiff must prove that

> the defendant made the statements with reckless disregard of whether they were true or false. The reckless conduct needed to show actual malice "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing," ... but by whether there is sufficient evidence "to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication[.]"

---

**3.** Plaintiff's counsel conceded at oral argument that Plaintiff is a public figure and that

this controversy concerns a matter of public concern.

*Id.* (internal quotation and other quotation omitted).

■ In determining whether the defendant harbored actual malice, the following factors are relevant:

(1) whether a story is fabricated or is based wholly on an unverified, anonymous source, (2) whether the defendant's allegations are so inherently improbable that only a reckless person would have put them in circulation, or (3) whether there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*Id.* (citing [*St. Amant,* 390 U.S.] at 732, 88 S.Ct. 1323, 20 L.Ed.2d 262).

With these general principles in mind, the Court will address each of the articles about which Plaintiff complains to determine, in the first instance, whether they contain any statements that could be considered defamatory.

### 1. *The February 13, 2001 article*

■ Plaintiff contends that this article "was libelous because it states that the audit was of 'En–Joie' " and then misquotes Mr. Coleman and attributes to him the statement "never, ever in 30 years have I seen record keeping as poor as En–Joie's," when in fact Mr. Coleman did not say that. *See* Amended Complaint at ¶ 437. Plaintiff also contends that the article is libelous *per se* because "it suggested to the reasonable reader that Mr. Karedes had mismanaged the books at the golf course in an unprecedented fashion, and therefore disparaged Mr. Karedes by suggesting fraud, misconduct and/or dishonesty in his profession, trade or business." *See id.* at ¶ 438.

After reviewing the February 13, 2001 article in its entirety, the Court finds that no ordinary person reading this article would find the statements about which Plaintiff complains to be " ' "reasonably susceptible of a defamatory connota-

tion." ' " *Lian,* 992 F.Supp. at 649 (quotation omitted). Despite Plaintiff's contention that the article disparaged him and suggested that he mismanaged the books, the article clearly states that the auditor stated that "no one person is to blame for the bookkeeping nightmare ... [and that] it was a failure of the club's—and the village's—internal control systems." *See* Amended Complaint at Exhibit "O." Moreover, the only statement which directly mentions Plaintiff states that he "did not think it would be fair to comment on the audit until he has a chance to read the final report." *See id.* Finally, in light of the fact that the audit itself was entitled "Village of Endicott, New York General Fund–Golf Department Audit Report for the Four Years Ended May 31, 1999," the statement in the article that the accounting firm audited En–Joie Golf Club is a reasonable construction of the scope of the audit and, in the context of the article as a whole, is not susceptible of a defamatory meaning. Nor can it be construed as a exposing Plaintiff " 'to public hatred, shame, ... or ... induc[ing] an evil opinion of [Plaintiff] in the minds of right-thinking persons, ...' " *Celle,* 209 F.3d at 177 (quotation and other citation omitted). Therefore, accepting as true the factual allegations in Plaintiff's amended complaint, to the extent that they do not conflict with the actual statements made in the exhibits attached to that complaint, the Court finds that Plaintiff cannot prove any set of facts that would support his libel claim to the extent that it is based upon the February 13, 2001 article. Accordingly, the Court grants the *Press & Sun–Bulletin*'s motion to dismiss the seventh cause of action with respect to this article.

### 2. *March 8, 2001 article*

■ Plaintiff asserts that the March 8, 2001 article is libelous *per se* because "it attributes to the audit a statement that

'En–Joie's books' were in 'such disarray' that no professional opinion could be issued as to the financial condition of En–Joie." *See* Amended Complaint at ¶ 443. Plaintiff asserts that the audit did not make such a statement and that "the audit dealt exclusively with the books of the Golf Department." *See id.* at ¶ 444. The specific statement about which Plaintiff complains states that "[a]fter looking at En–Joie's books, Coleman said, they were in such disarray that he refrained from issuing a professional opinion as to whether or not the financial statements offered a clear picture of the club's true financial condition." *See id.* at Exhibit "Q."

Although the audit itself does not use the term "disarray," it does state that [o]ur [audit] report dated August 28, 2000 on the Village's statements of revenues and expenditures—budget and actual—general fund—golf department for the four years ended May 31, 1999 was disclaimed. Our report was disclaimed because the Village did not maintain certain customary accounting records and supporting documents relating to transactions with vendors and customers, nor was the system of internal control adequate to provide safeguards of assets and assure proper recording of transactions. As a result, we were unable to satisfy ourselves that all revenues have been recorded and that all expenditures were actual obligations of the Village. *See* Amended Complaint at Exhibit "M" at Management Letter at 3 and Audit Report at 22.

The audit report also states that due to these problems, "it was impracticable to extend our procedures sufficiently to determine the extent to which the financial statements may have been affected by these conditions." *See id.* at Exhibit "M," Audit Report, at 2. Given this language in the audit, the article's use of the word "disarray" is not inherently false. More-

over, the article does not attribute the fault for this "disarray" to Plaintiff or to any other source within the Village. In fact, other than stating that Plaintiff questioned why the auditors did not visit the club to take a look at its daily operations, the article does not relate to Plaintiff or any involvement Plaintiff might have had with respect to this issue. Rather, the entire gist of the article is to ask whether Plaintiff had raised a legitimate concern; i.e., whether the auditors should have visited the club as part of their audit.

Therefore, accepting as true the factual allegations in Plaintiff's complaint, to the extent that they do not misstate or misconstrue the actual statements made in the exhibits attached thereto, the Court finds that Plaintiff cannot prove any set of facts to support his libel claim to the extent that it is based upon the March 8, 2001 article. Accordingly, the Court grants the *Press & Sun–Bulletin*'s motion to dismiss the seventh cause of action with respect to this article.

### 3. The February 25, 2001 article

█ Plaintiff contends that the February 25, 2001 article is libelous *per se* because "it attributes to the audit a finding that Mr. Karedes had arranged to have the Village pay for bills that should have been paid for by BCCC, when in fact the audit did not say that." *See* Amended Complaint at ¶¶ 439–440. Plaintiff also claims that Ms. Curtis–Sammon specifically relied upon the article when she first made her motion to terminate him and that, therefore, without the article he would not have been terminated. *See id.* at ¶ 441. Finally, Plaintiff contends that, upon information and belief, the article was a motivating factor in Mr. Burns and Mr. Cornick's decision to terminate him. *See id.* at ¶ 442.

Plaintiff grossly misstates the contents of the February 25, 2001 article. The article did not state that Plaintiff "arranged" for the Village to pay for bills that the BCCC should have paid. What the article did state was that "John Karedes, . . ., signed voucher after voucher that effectively passed the cost on to taxpayers. Two of the bills he signed away were addressed to the man who runs [BCCC], Alex Alexander." *See* Amended Complaint at Exhibit "P." The article goes on to state that "[i]n the last two years alone, Karedes signed more than a dozen vouchers that prompted the village to pay at least $151,676.47 worth of bills addressed to the B.C. Open[.]" *See id.* Plaintiff does not deny that he signed these vouchers and, in fact, the article states that "Karedes said it is possible that the contractors, all of whom also were doing work for [BCCC], addressed invoices meant for the village to the B.C. Open by mistake." *See id.* The article also quoted Plaintiff as stating, "No checks were written by me[.] . . . I followed the procedures that were given to me in 1996. If I knew a bill was the village's, that's what I paid. We looked at the job description to see who the work should have been charged to." *See id.* Moreover, the article very prominently stated that these are "Questionable vouchers" and that the vouchers were "addressed to the B.C. Open."

Viewing the article in its entirety and in light of the fact that Plaintiff does not deny that he signed the vouchers which were addressed to entities other than the Village, the Court finds that the February 25, 2001 article is not reasonably susceptible to a defamatory meaning. In fact, what it says is true: Plaintiff signed vouchers which were addressed to third-party entities and passed these vouchers along to the Village for payment. Accordingly, the Court grants the *Press & Sun–Bulletin's* motion to dismiss the seventh

cause of action with respect to the February 25, 2001 article.

### C. New York Civil Rights Law § 74

Alternatively, even if the Court were to find that any of the articles at issue contained libelous statements, Defendants argue that New York Civil Rights Law § 74 provides an absolute privilege from suit because all of the articles were a fair and true report of the proceedings and the audit.

New York Civil Rights Law § 74 provides that

A civil action cannot be maintained against any corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding, or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published.

This section does not apply to libel contained in any other matter added by any person concerned in the publication; or in the report of anything said or done at the time and place of such a proceeding which was not a part thereof.

N.Y. Civ. Rights Law § 74 (McKinney 1992) (emphasis added).

 In order to invoke the privileges of § 74, a defendant must show that the statements complained of are "fair and true reports of an official proceeding." *Easton v. Pub. Citizens, Inc.,* No. 91 CIV. 1639, 1991 WL 280688, *2 (S.D.N.Y. Dec.26, 1991). If a report is fair and true, § 74's privilege is "absolute, and is not defeated by the presence of malice or bad faith." *Glendora v. Gannett Suburban Newspapers,* 201 A.D.2d 620, 620, 608 N.Y.S.2d 239 (2d Dep't 1994) (citations omitted). Under § 74, the term "official proceeding" has been broadly construed to encompass any " ' "action taken by a person officially empowered to

do so." ' " *Easton*, 1991 WL 280688, at *2 (quoting *Freeze Right Refrigeration & Air Conditioning Servs. v. City of New York*, 101 A.D.2d 175, 475 N.Y.S.2d 383, 388 (App.Div.1984) (citation omitted)). The privilege, however, does not encompass "commentary on the proceeding or ... additional facts not established in the proceedings." *Id.*, 1991 WL 280688 at *3 (citations omitted).

 Whether an allegedly defamatory passage is a fair and true report "in the first instance is a question of law for the Court to determine." *Id.*, 1991 WL 280688 at *2 (citations omitted). "To come within the scope of [§ 74] 'the substance of the article [must] be substantially accurate.' " *Id.*, 1991 WL 280688 at *3 (quoting *Holy Spirit Ass'n for the Unification of World Christianity v. The New York Times Co.*, 49 N.Y.2d 63, 67, 424 N.Y.S.2d 165, 167, 399 N.E.2d 1185 (1979)). However, " '[a] fair and true report admits of some liberality; the exact words of every proceeding need not be given if the substance be substantially stated.' " *Id.* (quoting *Holy Spirit*, 49 N.Y.2d at 67, 424 N.Y.S.2d at 167, 399 N.E.2d 1185 (citations and quotations omitted)) (other citation omitted). "A report is 'substantially accurate' if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth." *Zerman v. Sullivan & Cromwell*, 677 F.Supp. 1316, 1322 (S.D.N.Y.1988) (citations omitted). As the New York Court of Appeals stated in *Holy Spirit*,

When determining whether an article constitutes a "fair and true" report, the language used therein should not be dissected and analyzed with a lexicographer's precision. This is so because a newspaper article is, by its very nature, a condensed report of events which must, of necessity, reflect to some degree the subjective viewpoint of its author. Nor should a fair report which is not misleading, composed and phrased in good faith under the exigencies of a publication deadline, be thereafter parsed and dissected on the basis of precise denotative meanings which may literally, although not contextually, be ascribed to the words used.

*Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*, 49 N.Y.2d 63, 68, 424 N.Y.S.2d 165, 399 N.E.2d 1185 (1979).

As a preliminary matter, Plaintiff's contention that § 74 is not applicable because this case is governed by the actual malice standard is misplaced. Plaintiff relies upon *Hogan v. Herald Co.*, 84 A.D.2d 470, 446 N.Y.S.2d 836 (4th Dep't), *aff'd* 58 N.Y.2d 630, 458 N.Y.S.2d 538, 444 N.E.2d 1002 (1982), to support this argument. However, as Defendants correctly point out, *Hogan* is inapposite because it addressed the Constitutional privilege of "neutral reporting" not the common law "fair report" privilege, which New York has codified in Civil Rights Law § 74. As Defendants also note, courts applying New York law have distinguished between these two doctrines. *See, e.g., Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*, 844 F.2d 955, 961 (2d Cir.1988) (after discussing the applicability of § 74, the court stated that "[w]e therefore need not consider the possible applicability of the first amendment privilege of neutral reportage articulated by this court in *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113 (2d Cir.), *cert denied sub nom. Edwards v. New York Times Co.*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977)." (footnote omitted)). The court in *Law Firm of Daniel P. Foster* also noted that, although one New York court had repudiated the *Edwards* rule, another court had cited it favorably. *See id.* n. 12 (citations omitted). In any event, the court noted that if it had reached the neutral reportage issue, it "would not be

bound by the expressions of New York courts concerning this issue of federal constitutional law, contrary to the rule concerning questions of state law arising in diversity cases." *Id.*

Alternatively, Plaintiff asserts that § 74 does not bar his claims against the *Press & Sun–Bulletin* based upon any of the articles. The Court will address each article in turn.

### 1. The February 13, 2001 article

■ Plaintiff asserts that his amended complaint sufficiently alleges that the February 13, 2001 article is not a fair and true reporting of what occurred at the February 12, 2001 Trustees meeting. Specifically, Plaintiff alleges in his amended complaint that the audit referred only to the Village's bookkeeping and that Mr. Coleman said "for the Village as a whole, in terms of the golf department ... I would say that I have never ever in 30 years of doing work both in private and in the public governmental environments seen record keeping as poor as this." Yet, according to Plaintiff, the article "quotes" Mr. Coleman as saying "never, ever in 30 years have I seen record keeping as poor as En–Joie's." *See* Plaintiff's Memorandum of Law at 23. Plaintiff maintains that there is a huge difference between reporting that Mr. Coleman said that the bookkeeping at the Village was poor and reporting that Mr. Coleman said that the bookkeeping at En–Joie (and thus by Plaintiff) was of unprecedented poor quality. *See id.* at 24. Furthermore, Plaintiff argues that the article is not a fair and true account of the audit because the audit does not mention Plaintiff's recordkeeping, but rather the Village's, and, thus, unless the Court finds that the audit determined that the distinction between Plaintiff and the Village is one without a difference it cannot grant Defendants' motion.

First of all, Plaintiff places too much emphasis on the distinction between "En–Joie," the golf course, and the golf department. Plaintiff himself uses these terms interchangeably in his amended complaint. Second, Plaintiff' s allegation that Mr. Coleman's statement about the status of the bookkeeping "for the Village as a whole, in terms of the golf department" is substantially different from the article's statement that the recordkeeping is poor at En–Joie has no merit. The auditors were specifically tasked with performing an audit of "the statements of revenues and expenditures—budget and actual—general fund—golf department of the Village[.]" *See* Amended Complaint at Exhibit "M" at Management Letter at 1. Moreover, the audit specifically addressed golf course operations and even more specifically the revenues and expenditures regarding the renovations at the golf course during the audit period. Furthermore, despite Plaintiff's allegation to the contrary, the article does not blame him for the bookkeeping problems that the audit uncovered. Rather, the article explicitly reports that Mr. Coleman stated that "no one person is to blame for the bookkeeping nightmare.... [I]t was a failure of the club's—and the village's—internal control systems. 'No one ever addressed these problems as they came up.'" *See* Amended Complaint at Exhibit "O." Moreover, the only mention of Plaintiff by name in the article is the statement that "he did not think it would be fair to comment on the audit until he has a chance to read the final report." *See id.*

Furthermore, the article never mentions "Plaintiff's bookkeeping" although it mentions the club's recordkeeping and bookkeeping. Likewise, the audit talks about the recordkeeping and the bookkeeping at the club, including the fact that the "Golf Department Management Consultant" approved and submitted for payment several

vouchers and related invoices, which the audit found troublesome. *See id.* at Exhibit "M" at 26. Therefore, based upon its review of the audit and the February 13, 2001 article, both of which are attached to Plaintiff's amended complaint, the Court finds that the February 13, 2001 article is a fair and true report of the audit. Accordingly, the Court grants the *Press & Sun-Bulletin*'s motion to dismiss the seventh cause of action to the extent that it is based upon this article.

## 2. The February 25, 2001 article

■ Plaintiff asserts that § 74 is not applicable to the February 25, 2001 article because that article is replete with editorial commentary detailing the *Press & Sun-Bulletin*'s own investigation and providing its own concurrence to the audit's findings. Specifically, Plaintiff points to the article's acknowledgment that "the *Press & Sun-Bulletin* examined dozens of bills, vouchers and checks that were singled out by [the auditors]...." Moreover, Plaintiff contends that the *Press & Sun-Bulletin* also indicated its concurrence with the audit's findings by stating

> What the audit does not say is that the common thread among many of what it called the golf course's most serious problems is Karedes' signature. He is the one who asked the village to pay bills addressed to the B.C. Open and never sought bids to keep the costs down, records show.

> One day in May 1999, for example, Karedes signed away more than $35,000 in bills addressed to B.C. Open. One of the bills, submitted by Frazier's Landscapes Inc., of Owego, was for excavating the 18th fairway—work [BCCC] promised to do with its own money when it inked its deal to build the En–Joie Golf Course into the kind of place that could host

Professional Golfers Association tournaments in 1996.

*See* Amended Complaint at Exhibit "P."

Defendants assert that Plaintiff mischaracterizes these statements as "additional facts and concurring opinions." According to Defendants, because Plaintiff does not dispute that the bills that the En–Joie Golf Course received, and he approved for the Village to pay, and the other documents that he cites were part of the Village's records and formed the foundation for much of the audit, the protection of § 74 applies with equal force to those documents and to government reports that summarize those records. *See* Defendants' Reply Memorandum of Law at 4.

The Court agrees with Defendants. In Section II—Financial Statement Findings, the audit states that despite the contract between the Village and BCCC relating to the reconstruction of the En–Joie Golf Course that BCCC "was to furnish all necessary labor, materials, equipment, tools and perform all work necessary for the reconstruction of the tees, fairways, and greens at En–Joie Golf Course according to the architectural drawings" [and] [that] "[t]he Village was to incur none of the expenditures associated with the reconstruction except for providing [BCCC] with engineering services[,]" "during the reconstruction period, it appears that the Village paid three vendors over $153,000 for invoices billed to [BCCC]/B.C. Open." *See* Amended Complaint at Exhibit "M" at 25. The audit went on to state that "[d]uring the four years ending May 31, 1999, it appears that the Village also paid other invoices billed to BCCC/ B.C. Open [in the amount of $7,811]." The audit also noted that

> [t]he Village's procedures require the Village official originating a claim voucher to sign the claim voucher for approval and submit the invoice for approval for

payment by the Board of Trustees. The claim vouchers and related invoices discussed above, with a few exceptions, were approved and submitted for payment approval by the Golf Department Management Consultant. However, pursuant to the Management Consultant Agreement, the Consultant was to only prepare bills and accounts payable and submit to the Village Treasurer's office for approval.

*See id.* at 26.

The audit concluded that the effect was that "[t]he Village paid invoices that may not be obligations of the Village." *See id.* Given these statements and conclusions in the audit, the statement above about which Plaintiff complains is a fair and true report of the information contained in the audit report and the documents upon which this report was based.

 Plaintiff's next argument is that even if § 74 applies to the February 25, 2001 article, it does not provide a defense warranting dismissal because his amended complaint adequately pleads that the article was not a "fair and true" recitation of an official proceeding. Specifically, Plaintiff complains that the headline of the article "Taxpayers Footed B.C. Open Bills" is itself susceptible to a libelous interpretation and, therefore, even if the Court were to find that the article itself was inoffensive, he could maintain a cause of action based upon the headline alone. This contention, however, is not an entirely accurate statement of the law. Under New York law, " '[d]efamatory head lines are actionable though the matter following is not, unless they fairly indicate the substance of the matter to which they refer, and . . . unless they are a fair index of the matter contained in the truthful report.' " *Schermerhorn v. Rosenberg,* 73 A.D.2d 276, 286, 426 N.Y.S.2d 274 (2d Dep't 1980) (quoting *Lawyers' Co-op Pub. Co. v. West Pub. Co.,* 32 App.Div. 585, 590, 52 N.Y.S.

1120) (other citation omitted) (emphasis added); *see also Becher v. Troy Publ'g Co. Inc.,* 183 A.D.2d 230, 236, 589 N.Y.S.2d 644 (3d Dep't 1992) (finding that since each headline at issue was a fair and true headnote of the article it was entitled to absolute immunity under § 74). At oral argument, Plaintiff's counsel acknowledged that the headline fairly indicated the substance of the matter of the article. Therefore, if the Court finds that the February 25, 2001 article itself is a fair and true report then the allegedly offensive headline will also be entitled to § 74's absolute immunity.

Plaintiff claims that the February 25, 2001 article was not true because there is a world of difference between the audit's finding that the Village paid bills addressed to BCCC and the article's statement that the audit concluded that the bills represented obligations of BCCC that were improperly paid by the Village at Plaintiff's urging. *See* Plaintiff's Memorandum of Law at 20. The problem with this argument is that the article does not state what Plaintiff asserts that it states. The article continually states that the bills were "addressed" to the B.C. Open. In addition, the audit itself states that "during the reconstruction period, it appears that the Village paid three vendors over $153,000 for invoices billed to [BCCC]/B.C. Open. . . . [and that these] vouchers and related invoices . . . , with a few exceptions, were approved and submitted for payment approval by [Plaintiff]." *See* Amended Complaint at Exhibit "M" at 25–26. The audit concludes that the effect is that "[t]he Village paid invoices that may not be obligations of the Village." *See id.* at 26. Moreover, with respect to the statement in the article that "[s]ome of the vouchers [Plaintiff] signed are for bills addressed to the B.C. Open for work that auditors said was supposed to be done by [BCCC]," the audit states that under the agreement between the Village and BCCC, "[t]he Vil-

lage was to incur **none of the expenditures** associated with the reconstruction except for providing [BCCC] with engineering services." *See id.* at 25 (emphasis added).[4]

■■■ Since Plaintiff has attached a copy of both the audit and the February 25, 2001 article to the amended complaint, the Court may rely upon them to determining the legal sufficiency of Plaintiff's claims. Moreover, to the extent that the allegations in the amended complaint contradict or do not accurately represent the statements in the article or the audit, the Court need not accept them as true. Based upon its review of the audit and the February 25, 2001 article, the Court finds that Plaintiff can prove no set of facts to support his claim that the February 25, 2001 article was not a fair and true recitation of either the contents of the audit or the discussion at the Trustees' meeting, which addressed the audit's findings. Therefore, the Court

concludes that § 74's privilege against suit applies to the February 25, 2001 letter. Accordingly, the Court grants the *Press & Sun–Bulletin*'s motion to dismiss the seventh cause of action to the extent that it is based upon this article.[5]

### 3. The March 8, 2001 article

Plaintiff asserts that the March 8, 2001 article was not a fair and true report of the audit basically for the same reasons as the February 13, 2001 article. Specifically, Plaintiff contends that by transferring the audit's findings of poor recordkeeping on the part of the Village to Plaintiff, the *Press & Sun–Bulletin* undid his reputation in the community and significantly devalued his education. *See* Plaintiff's Memorandum of Law at 35.

The Court finds that the March 8, 2001 article is a fair and true report of the audit for the same reasons that the Court concluded that the February 13, 2001 article is

---

4. The audit cited the portion of the agreement between the Village and BCCC which specifically provided that " '... nothing provided herein shall create any obligation on the part of [the Village] or to see to the payment of any moneys to any subcontractor or material men from any contractor nor shall anything provided herein serve to create any relationship in contract or otherwise, implied or expressed, between subcontractor or materialmen and [the Village].' " *See* Amended Complaint at Exhibit "M" at 25.

5. Plaintiff also makes an argument with respect to the "fairness" prong of the "fair and true" test based upon the way the article was prepared on the following grounds (1) the *Press & Sun–Bulletin* knew that Mr. Coleman had made it absolutely clear that the auditors had not made the finding that the Village paid the bills of other people; (2) the *Press & Sun–Bulletin* was aware that Mayor Colella harbored ill will towards Plaintiff; (3) the Mayor requested the article approximately one week after the Village had lost Plaintiff's Article 78 proceeding; (4) the article was an "investigative saga" prepared over at least a two-day period that purposefully was made the center-

piece of the Sunday edition; (5) the article was not prepared by Mr. Moyer, the reporter who had covered the En–Joie saga to the exclusion of nearly every other *Press & Sun–Bulletin* reporter and who knew what Mr. Coleman said at the February 12, 2001 Trustees' meeting. *See* Plaintiff's Memorandum of Law at 20–21.

Although Plaintiff asserts these arguments to support his position that the February 25, 2001 article was unfair, these arguments are more appropriately considered in the context of "actual malice." However, because the February 25, 2001 article falls within the ambit of § 74's protection, the issue of malice is irrelevant. *See Glendora*, 201 A.D.2d at 620, 608 N.Y.S.2d 239. Moreover, the alleged ill will that Mayor Colella harbors against Plaintiff does not "automatically disqualify [him] as [a] legitimate source[ ] of information. Nor would [the *Press & Sun–Bulletin*'s] knowledge of this potential bias impose on [the *Press & Sun–Bulletin* ] an additional burden of extensive independent investigation." *Loeb v. New Times Communications Corp.*, 497 F.Supp. 85, 92 n. 12 (S.D.N.Y.1980) (citation omitted).

a fair and true report of the audit. In addition, the entire gist of the March 8, 2001 article is to determine whether Plaintiff had a legitimate argument that the auditors should have visited the club to take a look at its operations as part of the audit. *See* Amended Complaint at Exhibit "Q." Thus, despite Plaintiff's arguments to the contrary, the March 8, 2001 article did not disparage him in any way or even mention him in connection with the bookkeeping. Moreover, as mentioned above, the audit does mention that Plaintiff approved invoices which were addressed to BCCC/B.C. Open, which were passed on to the Village for payment. Plaintiff, although offering an explanation for having done so, does not dispute that he approved these invoices. Therefore, the Court concludes that the March 8, 2001 article comes within the protection of § 74. Accordingly, the Court grants the *Press & Sun–Bulletin*'s motion to dismiss the seventh cause of action to the extent that it is based upon this article.

## IV. CONCLUSION

After carefully considering the file in this matter, the parties' submissions and oral arguments, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Defendants Binghamton Press Company, a Division of Gannett Satellite Information Network, Inc. and Gannet Company, Inc.'s motion to dismiss the seventh cause of action is **GRANTED**.

**IT IS SO ORDERED.**