CALVIN KLEIN TRADEMARK
TRUST and Calvin Klein,
Inc., Plaintiffs,

v.

Linda WACHNER, the Warnaco Group,
Inc., Warnaco Inc., Designer Holdings
Ltd., CKJ Holdings, Inc., Jeanswear
Holdings, Inc., Calvin Klein Jean-
swear Company and Outlet Holdings,
Inc., Defendants.

No. 00 Civ. 4052(JSR).

United States District Court,
S.D. New York.

Jan. 5, 2001.

Jonathan Schiller, David Boyd, Armonk, NY, for Plaintiffs.

Gregory Craig, Paul Gaffney, Washington, DC, for Defendants.

### MEMORANDUM

RAKOFF, District Judge.

By Order dated October 10, 2000, the Court granted plaintiffs' motion to dismiss Count Eight of defendants' amended counterclaims; granted plaintiffs' motion to dismiss Count Nine of the counterclaims except to the extent that that Count is premised on the alleged occurrence of a "CKI Event"; held that liability under Counts One and Two of the counterclaims could not be premised on any alleged modification of the relevant contracts by conduct or oral agreement; and denied plaintiffs' motion to dismiss Counts Three through Seven of defendants' counterclaims, which allege defamation, trade libel, and tortious interference with business relations. Following the close of discovery, plaintiffs in effect renewed their motion for dismissal of Counts Three through Seven of the counterclaims in the form of a summary judgment motion, but this motion was also denied.[1] *See* Order dated December 19, 2000. The instant Memorandum briefly elucidates the reasons for these rulings.

The basic background facts in this case are set forth in *Calvin Klein Trademark Trust v. Wachner,* 123 F.Supp.2d 731, 732–33 (S.D.N.Y.2000), familiarity with which is here presumed. In brief, in March 1994 plaintiff Calvin Klein, Inc. ("CKI") entered into various agreements with defendants The Warnaco Group, Inc. and Warnaco, Inc. ("Warnaco") whereby CKI and Warnaco became co-beneficial owners of the Calvin Klein Trademark Trust (the "CK Trust"), a Delaware business trust the corpus of which is comprised of the trademarks "Calvin Klein," "CK/Calvin Klein," "CK/Calvin Klein Jeans," and "CK" (collectively, the "Marks"). In return for conveying its trademark interests to the Trust, CKI received three classes of certificates representing ownership rights with respect to differing usages of the Marks. Two classes, representing such rights with respect to use of the Marks on and in connection with women's intimate apparel and men's underwear, were sold to Warnaco, while CKI retained ownership of the other class of certificates representing such rights with respect to the use of the Marks on or in connection with all other products. CKI also conveyed to Warnaco

---

1. In the period between plaintiffs' motions, defendants were given leave to file a Second Amended Answer and Counterclaims, which, *inter alia,* added Mr. Calvin Klein personally as a defendant to Counts Five and Six of the counterclaims, based on new factual allegations contained therein, and added new factual allegations to Count Seven of the counterclaims.

an exclusive license to use the Marks on and in connection with the manufacture, distribution, and marketing of men's belts and other accessories. Additionally, in 1997, Warnaco acquired an exclusive license to sell jeanswear bearing the Marks and to maintain and operate Calvin Klein Outlet Stores for the duration of the jeanswear license. Subsequently, however, disputes arose among the parties to these various agreements, giving rise to the instant litigation.

■ *Counterclaim Eight.* The "Trust Agreement" that established the CK Trust provided that while the trust would have no officers, employees or other management, the CK Trust would employ a "Servicer" to take action to protect the Marks and to fulfill the responsibilities of the CK Trust under both the Trust Agreement and a separate "Quality Assurance Agreement," also executed in March 1994. *See* Plaintiffs' Exhibits, Ex. 1 ("Trust Agreement"), § 4.01; Ex. 6 ("Quality Assurance Agreement"). CKI agreed to act as Servicer for the CK Trust under a "Servicing Agreement." *See* Plaintiffs' Exhibits, Ex. 4 ("Servicing Agreement"). Count Eight of the counterclaims alleges that the Servicing Agreement and the Trust Agreement impose "fiduciary duties" on CKI, which CKI violated by filing the instant lawsuit without prior notice to or consultation with Warnaco, by making claims against Warnaco, denigrating Warnaco, and disparaging the quality of Warnaco's products produced under the Marks, and by generally engaging in a public campaign to damage the Marks. *See* Amended Counterclaims, ¶ 118.

Counterclaim Eight must be dismissed, however, because (among other deficiencies) it premises a fiduciary relationship that does not exist. As the Court has previously held, the CK Trust is simply a means by which the sophisticated parties entered into arm's-length business arrangements that created ordinary contractual relations between them. *See Calvin Klein Trademark Trust,* 123 F.Supp.2d

731, 734–35. Indeed, defendants themselves have repeatedly urged the Court to construe the CK Trust in this fashion. *See, e.g.,* transcript of oral argument on defendants' motion to dismiss, 8/3/00, at 35–37; Supplemental Memorandum in Support of Defendants' Motion to Dismiss, at 7.

Likewise, the Servicing Agreement, on its face, is an arm's-length contract between sophisticated parties that will not be held to entail fiduciary duties absent some express agreement to that effect. *See id.,* at 733. Indeed, the Servicing Agreement suggests, if anything, the absence of any fiduciary relationship, for it explicitly disavows any joint venture or partnership relationship between CKI, as Servicer, and the CK Trust or the beneficial owners, *see* Servicing Agreement, § 5, and states that the Servicer is to be considered an "independent contractor" at least in regards to the manner in which the Servicer carries out its duties under the Servicing Agreement. *Id.* at § 4.

To be sure, the Servicing Agreement expressly states what the law would in any event imply, to wit, a duty of the Servicer to proceed in "good faith." *See* Servicing Agreement, ¶ 6(a). This is far removed, however, from the much higher duties created by a fiduciary relationship, and will at most support a claim for contractual breach, which is not what Count Eight alleges. Nor is the failure to so allege accidental, since, under the terms of the Servicing Agreement, CKI had no duty to give notice to Warnaco of the instant lawsuit prior to the filing and service of the Complaint, nor, for that matter, did the Servicing Agreement impose on CKI any of the other, rather nebulous duties that Court Eight alleges. In short, on any analysis, Count Eight of the counterclaims must be dismissed.

*Counterclaim Nine.* To the extent that Count Nine of defendants' counterclaims seeks removal of CKI as Servicer of the CK Trust on the ground that CKI failed in its alleged duty to notify Warnaco of this

lawsuit, the Count must be dismissed for the reasons already stated. Count Nine separately alleges, however, that such removal is warranted because a "CKI Event" has occurred as defined by the terms of a separate "Administration Agreement" entered into by the parties as part of the March 1994 transactions. *See* Plaintiffs' Exhibits, Ex. 5 ("Administration Agreement"). Under the Administration Agreement, a "CKI Event" is said to occur when, *inter alia,* "Mr. Calvin Klein ceases to exercise control over design, advertising or promotion of products sold under or in connection with the Trademarks." Administration Agreement, § 1.4(c). The Servicing Agreement, in turn, provides, in effect, that when such a "CKI Event" happens, Warnaco can replace CKI as Servicer with respect to the Marks that Warnaco owns. Since Count Nine adequately alleges that Mr. Klein has failed to fulfill obligations imposed by § 1.4(c) of the Administration Agreement, this alternative basis for Count Nine survives dismissal.

■ *Counterclaims One and Two.* Counts One and Two of defendants' counterclaims allege that CKI breached the Jeanswear License Agreement and Men's Accessories License Agreement, either by their terms or as these agreements were "modified by the course of conduct and oral agreement of the parties." *See* Amended Counterclaims, ¶¶ 63–77. However, express provisions in both agreements explicitly state that the agreements "may not be modified, discharged or terminated except by written agreement signed by both parties, and none of the provisions hereof may be waived orally." Plaintiffs' Exhibits, Ex. 7, § 18.3; *see also* Plaintiffs' Exhibits, Ex. 8, § 14.3. Consequently, Counts One and Two may only be premised on breaches of the express terms of the agreements themselves and not on any alleged modification by conduct or oral agreement.

*Counterclaims Three Through Six.* As presently pled, Counts Three through Six of defendants' counterclaims allege claims of defamation and trade libel against CKI and third-party defendant Calvin Klein. Counts Three and Four allege these violations in connection with a meeting of apparel industry executives on May 31, 2000 (the so-called "Fairchild Summit") at which Mr. Klein is alleged to have described Warnaco's conduct as being "equivalent" to "counterfeiting," and in connection with Mr. Klein's interview of June 5, 2000 on the *Larry King Live* television program, during which Mr. Klein allegedly disparaged the quality of Warnaco's jeanswear products and manufacturing. Counts Five and Six allege these violations in connection with a letter and accompanying press release that CKI and Mr. Klein allegedly circulated on May 30, 2000, the same day as the filing of this lawsuit, in which CKI and Mr. Klein allegedly falsely described the suit as relating to the quality of Warnaco's products, including underwear products nowhere referred to in the Complaint, and also likened Warnaco's practices to "counterfeiting."

■ In assessing the legal sufficiency of these claims, a threshold issue is whether the counterclaiming "victims" of the alleged defamation and libel are "public figures," who must prove "actual malice" on the part of the alleged defamers in order to prevail. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 255–56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While conceding that the counterclaiming defendants are not "general purpose" public figures, *see* transcript of oral argument, 12/14/00, at 68–69, plaintiffs contend that these defendants are public figures of the "limited purpose" kind, *i.e.* those who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." 418 U.S. at 351, 94 S.Ct. 2997. Specifically, in the Second Circuit, a claimant is to be considered a "limited purpose" public figure if he (or she or it) has:

(1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of the litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.

*Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 136–37 (2d Cir.1984)

Here, the statements alleged to be defamatory and libelous chiefly relate either to the quality of goods produced by Warnaco that bore the Marks or to the alleged passing-off of other Warnaco goods as Calvin Klein goods. *See* Second Amended Counterclaims, ¶¶ 80–81, 94–99.[2] Prior to plaintiffs' making these statements, however, there was no "public controversy" over the issues of the quality of Warnaco goods or non-Calvin-Klein goods being passed off as Calvin Klein goods. Rather, at most, there were disputes between the parties regarding design and distribution practices that occasionally surfaced publicly. As the Fifth Circuit Court of Appeals noted in *Snead v. Redland*, 998 F.2d 1325, 1330 (5th Cir.1993), "[a]lthough an intellectual property dispute might rise to a matter of public concern if it concerns a product of extreme importance (e.g. a miracle drug), ordinarily such disputes between two parties will be matters of private concern." 998 F.2d at 1330. On any analysis, therefore, the statements here in issue were not part of any ongoing public controversy.

Moreover, even if, contrary to fact, there did exist such a "public controversy," CKI and Mr. Klein have failed to adduce material evidence that the counterclaiming de-

fendants "injected" themselves into it. Of the various press releases, news articles, and interviews from trade and popular newspapers that CKI and Mr. Klein rely on in this respect, none directly relates to the quality of Warnaco's goods or to passing-off or "counterfeiting." Rather, they relate, at most, to issues regarding Warnaco's distribution practices that are not the subject of the alleged defamatory statements nor reasonably related thereto.

■ While, to be sure, defendants subsequently publicly denied the allegations here claimed to be defamatory, such subsequent denials do not constitute their "injecting" themselves into a public controversy. An individual does not forfeit the protections against defamation and libel accorded to private persons simply because he or she is forced to respond publicly to the allegedly defamatory or libelous statements themselves. *See Hutchinson v. Proxmire*, 443 U.S. 111, 135–36, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979); *see also Time, Inc. v. Firestone*, 424 U.S. 448, 457, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). Accordingly, the Court finds that the "actual malice" standard of defamation and libel is inapplicable to defendants' counterclaims.

■ On the lower standard applicable to non-public-figures, the alleged defamations and libels are matters for the jury. Plaintiffs contend, however, that the allegedly defamatory and libelous statements are protected by Section 74 of the New York Civil Rights Law, which provides that "[a] civil action cannot be maintained against any person firm or corporation, for the publication of a fair and true report of any judicial proceeding." N.Y. Civil Rights L. § 74 (McKinney's 2000). Plaintiffs argue that the alleged defamatory and libelous

2. The only potential exception is a statement in the press release of May 30, 2000, that "Warnaco is threatening to erode Calvin Klein jeanswear and underwear lines through a flood of discounting and other unauthorized sales and practices that are the equivalent of counterfeiting." *See* Second Amended Counterclaims, ¶ 99. While parts of this statement might be interpreted as relating to the sepa-

rate issue of Warnaco's distribution practices, a reasonable juror could find that the central thrust of this statement, like the other allegedly defamatory statements, concerns the quality and authenticity of Warnaco's products bearing the Marks. On defendants' own theory, only if the jury so finds will defendants be able to predicate a defamation or libel claim on this statement.

statements at issue here, which were published following the commencement of this litigation, constitute a "fair and true" report of the allegations contained in the Complaint.

A report may be considered "fair and true" under Section 74 if its substance is substantially accurate. *See, e.g., Holy Spirit Assn. v. New York Times Co.,* 49 N.Y.2d 63, 67, 424 N.Y.S.2d 165, 399 N.E.2d 1185 (1979); *Wenz v. Becker,* 948 F.Supp. 319, 324 (S.D.N.Y.1996). A report cannot be said to be "substantially accurate," however, if it would have a "different effect" on the mind of the recipient than the "actual truth." *Daniel Goldreyer, Ltd. v. Van de Wetering,* 217 A.D.2d 434, 630 N.Y.S.2d 18, 22 (1995). In other words, Section 74 does not afford protection if the specific statements at issue, considered in their context, "suggest[ ] more serious conduct than that actually suggested in the official proceeding." *Id.*

Here, a reasonable juror could find that Mr. Klein's comments at the Fairchild Summit suggested a form of fraud and "counterfeiting" on the part of defendants going well beyond anything reasonably suggested by the allegations of the Complaint, which relate to contractual breaches, trademark violations, and unauthorized distribution practices. Similarly, a reasonable juror could well determine that Mr. Klein's comments on *Larry King Live* were intended to, and did, suggest problems in the quality and authenticity of Warnaco's goods going beyond anything fairly inferable from the Complaint. At most, a few snippets in the Complaint obliquely refer to design problems that indirectly might have affected quality: but this is far removed from the more frontal suggestions of deficient quality that a reasonable juror might find Mr. Klein to have suggested in the interview. Finally, as to the letter and press release of May 30, 2000, these likewise contain statements that a reasonable juror could find go well beyond the allegations of the Complaint, insofar as they suggest quality problems with Calvin Klein products manufactured by Warnaco. The Court therefore finds

that Section 74 immunity is, at best, a jury question and cannot support summary judgment in plaintiffs' favor.

■ *Counterclaim Seven.* Although Count Seven of the counterclaims asserts that the statements of Mr. Klein on *Larry King Live* amounted to tortious interference with the existing and prospective business relations of Calvin Klein Jeanswear, Inc., a subsidiary of Warnaco, plaintiffs contend that Count Seven repackages defendants' corresponding defamation and libel claims and therefore must be dismissed on the ground that, under New York law, damage to one's reputation alone cannot form the basis of a tortious interference claim. *See, e.g., Tasso v. Platinum Guild Int'l,* 1997 WL 16066, at *4 (S.D.N.Y.1997). In other words, tortious interference claims must, at the very least, allege specific pecuniary, rather than solely reputational, injury.

Here, however, defendants' do just that, alleging a loss of jeanswear sales to potential customers as a direct result of Mr. Klein's *Larry King Live* interview. Even though defendants' defamation claims also refer to this same loss of business as a form of damages, *see* Second Amended Counterclaims, ¶¶ 87, 92, 103, 108, there is no reason why defendants should be precluded from seeking compensation for such damage under two distinct legal theories, so long as no double recovery is permitted.

■ Plaintiffs separately contend that defendants have failed to adduce evidence that satisfies each of the four elements of a tortious interference claim: (1) business relations with a third party; (2) interference with those business relations; (3) actions taken for the sole purpose of causing harm to the claimant or the use of dishonest, unfair, or improper means; and (4) injury to the business relationship. *See Nadel v. Play–by–Play Toys & Novelties, Inc.,* 208 F.3d 368, 382 (2d Cir.2000). In particular, plaintiffs contend that defendants have failed to establish either the existence of Warnaco's prospective business relationships with the third parties it identifies in its counterclaims, *see* Second

Amended Counterclaims, ¶¶ 111–112, or the causal nexus between the conduct complained of and the alleged damage to Warnaco's business.

In fact, however, defendants have adduced sufficient evidence to survive summary judgment. For example, a letter dated June 12, 2000 from Louise Tanguay–Papp, a vice-president at Shirmax, Ltd. a Canadian retailer, to Suzanne Karkus, President of CKJ's Womens Division, explains that "[f]ollowing the Calvin Klein/Larry King interview of last week on CNN, we received numerous calls from our store managers, concerned about the negative press that Calvin Klein Jeanswear had received and the impact that this would have on us, resulting in lesser than expected sales." *See* Exhibits Cited in Defendant–Counterclaimants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment ("Defendants' Exhibits"), Ex. 30. The letter also confirms "the delay of the CK plus-size launch" in Shirmax stores "to the Spring of 2001." As explained by the Declaration of Suzanne Karkus, dated November 30, 2000, also part of the record, *see* Defendants' Exhibits, Ex. 31, Shirmax had previously expressed its intention to purchase nearly $400,000 in jeanswear from CKJ in the year 2000. According to Ms. Karkus, this purchase was canceled by Shirmax as a result of the *Larry King Live* interview.

There is also the sworn Declaration of Joel Rosenthal, Director of Sales and New Business Development for the International Division of Warnaco, dated November 30, 2000, which avers that on June 9, 2000, Sportzone, a Venezuelan company, reduced its previous order of $1,500,000 in unspecified Warnaco products to $350,000, and that this reduction was explained to Mr. Rosenthal by Sportzone's President Camilo Ibrahim as being the result, at least in part, of the "disparaging comments about the quality of Calvin Klein jeans" made by Mr. Klein on the *Larry King Live* show. *See* Defendants' Exhibits, Ex. 32. While as such the latter assertions would be inadmissible hearsay, defendants have also submitted a separate declaration, also dated November 30, 2000, from Mr. Ibrahim himself, confirming Mr. Rosenthal's statements. *See* Defendants' Exhibits, Ex. 33.

██ The Court finds that this evidence is sufficient to create a genuine issue of material fact both as to the existence of business relations between Warnaco and Shirmax or Sportzone and as to whether Mr. Klein's statements were the cause of defendants' lost sales.

Finally, plaintiffs assert that defendants have failed to allege that CKI or Mr. Klein used any "improper means" to harm the defendants or that they acted with the sole purpose of doing so. However, defendants' defamation claims arising from the *Larry King Live* interview have survived summary judgment, and defamation surely counts as an improper means by which to interfere in the business relations of another. *See, e.g., Purgess v. Sharrock,* 33 F.3d 134, 141 (2d Cir.1994).

Accordingly, the Court hereby reconfirms its Order dated October 10, 2000 and the portion of its Order dated December 19, 2000 relating to the same subject matter.