**John L. KAREDES, Plaintiff–Appellant,**

v.

**The ACKERLEY GROUP, INC., WIVT Newschannel 34, WBGH Newschannel 5, Binghamton Press Company, Division of Gannett Satellite Information Network, Inc. and Gannett Company, Inc., Defendants–Appellees,**

**The Village of Endicott, Michael E. Colella, Individually, and in his capacity as Mayor of the Village of Endicott, Jackie Sammon, in her capacity as Trustee of the Village of Endicott, Bonnie Cornick, in her capacity as Trustee of the Village of Endicott and Timothy Burns, in his capacity as Trustee of the Village of Endicott, Defendants.**

**Docket No. 04–2376–CV.**

United States Court of Appeals,
Second Circuit.

Argued: July 14, 2005.

Decided: Sept. 9, 2005.

John A. Gallagher, High, Swartz, Roberts & Seidel, LLP, Norristown, PA (Theodosis J. Totolis, Endicott, NY, on the brief), for Plaintiff–Appellant.

Walter E. Diercks, Rubin, Winston, Diercks, Harris & Cooke, LLP, Washington, DC (Jeffrey Harris, Rubin, Winston, Diercks, Harris & Cooke, LLP, Washington, DC, on the brief), for Defendants–Appellees the Ackerley Group, Inc., WIVT Television Newschannel 34 and WBGH Newschannel 5.

Charles D. Tobin, Holland & Knight LLP, Washington, DC (Kara L. Daniels, Holland & Knight LLP, Washington, DC, on the brief), for Defendants–Appellees Binghamton Press Company, a division of Gannett Satellite Information Network, Inc., and Gannett Company, Inc.

Before: WINTER and JACOBS, Circuit Judges, and GLEESON, District Judge.*

JACOBS, Circuit Judge.

Plaintiff-appellant John L. Karedes was the manager of a public golf course undergoing renovations in the Village of Endicott, New York ("the Village"). Some of the renovations were to be paid for by the Village and some by a local charity that hosts a professional golf tournament at the course. It is alleged that Karedes redirected invoices sent by contractors who were confused about which entity to bill for what and sent to the Village for payment some invoices that were mistakenly issued to the charity. After a financial audit of the Village criticized such irregularities (among other loose practices), local media coverage of the audit included the report that the Village suffered loss by paying invoices directed to it by Karedes.

Karedes commenced an action in the United States District Court for the Northern District of New York (Scullin, C.J.), pleading claims under New York law for libel against Binghamton Press Company and Gannett Co., owners of the Press & Sun–Bulletin (collectively, the "Press & Sun–Bulletin"), and for defamation against the Ackerley Group, Inc., WIVT News Channel 34, and WBGH News Channel 5 (collectively, "News Channel 34"). Karedes appeals from the dismissal of his claims on the pleadings.

The district court granted the motions to dismiss—filed by Press & Sun–Bulletin under Rule 12(b)(6) and by News Channel 34 under Rule 12(c)—on the ground that the reports at issue were substantially true and therefore not defamatory. We conclude that a reasonable jury could find the reports to have defamatory meaning, and to be false.

**BACKGROUND**

Because Karedes' claims were dismissed on motions addressed to the pleadings, the following facts are drawn from the complaint and the documents on which it relies. *See Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 165 (2d Cir.2005).

The Village retained Karedes in 1996 to manage its public golf course, the En Joie Golf Club (the "Golf Club"). The Golf Club hosts a PGA Tour event called the

---

* The Honorable John Gleeson, United States District Judge for the Eastern District of New York, sitting by designation.

"B.C. Open," which is sponsored by the Broom County Communities Charities ("BCCC") pursuant to a contract between the Village and the BCCC.

In 1995, the BCCC requested and received Village approval for certain Golf Club improvements that were deemed needed by the PGA Tour and that BCCC undertook to fund. While that project was underway, the Village decided to make additional improvements, at its own expense. The Village paid by check for materials and services used in its own improvements; each such check was drafted by the Village's Treasurer, and approved by the Village's Board of Trustees ("Board"), on the basis of invoices. All such payments were first reviewed and approved by Karedes.

The Golf Club and the renovations became the focus of public and political controversy. In the period from 1996 to 1999, while both the BCCC renovations and the Village renovations were ongoing, the Golf Club operated at a loss. In February 2000, after Mayor Michael E. Colella was sworn in, the Village's "Golf Advisory Committee" issued a report entitled "John Karedes' Budget Information," which stated that between 1997 and 1999 the Golf Club was more than $1 million over budget. Soon after, the Board nevertheless extended Karedes' management contract, but Mayor Colella refused to sign it. Instead, at the Mayor's request, the Board commissioned an independent audit of the Golf Club's accounting. According to Karedes, Mayor Colella then "embarked on a long, continual campaign to destroy Mr. Karedes' reputation and standing in the community by intentionally and repeatedly making false accusations" and invited the district attorney to investigate Karedes' contract.

The audit, which was performed by Piaker & Lyons, was released at a Febru-

ary 12, 2001 public town meeting. The audit identified several problems with the Village's management of the Golf Club, including that "[t]he Village paid invoices billed to and addressed to another entity." This criticism was supported by the following particulars:

In September 1996, the Village of Endicott (Owner) and Broome County Community Charities, Inc./B.C. Open (Contractor) entered into an agreement for the reconstruction of the Village's En-Joie Golf Course. Pursuant to this agreement, ... [t]he Village was to incur none of the expenditures associated with the reconstruction except for providing the Contractor with engineering services.... However, during the reconstruction period, it appears that the Village paid three vendors over $153,000 for invoices billed to [BCCC].

. . .

Other invoices from two of the vendors discussed above were billed to the Village. Based on the Village of Endicott Superintendent of Public Work's review of these it appears that the work performed by the vendors is similar to the work indicated in invoices billed to BCCC/B.C. Open and paid by the Village.

. . .

The Village's procedures require the Village official originating a claim voucher to sign the claim voucher for approval and submit the invoice for approval for payment by the Board of Trustees. The claim vouchers and related invoices discussed above, with a few exceptions, were approved and submitted for payment approval by the Golf Department Management Consultant [Karedes]. However, pursuant to the Management Consultant Agreement, the Consultant was to only prepare bills and accounts

payable and submit to the Village Treasurer's officer for approval.

. . .

The Village paid invoices that may not be obligations of the Village.

. . .

Village officials may wish to review all invoices during the audit period to determine if any expenditures were not the responsibility of the Village.

The audit also listed "[i]nvoices billed to BCCC / B.C. Open and paid by Village" amounting to $161,044 and "[o]ther related invoices" amounting to $46,756, but noted that $29,827 of those invoices were "determined by the Village to be [the] responsibility of [the] Village." Finally, the audit concluded that some projects were not sent out for competitive bidding, as a result of which "[t]he Village may have overpaid for goods and services, which were not received or received in an unacceptable condition or not related to golf department operations."

Kenneth Coleman, a Piaker & Lyons auditor, was present at the February 12 meeting to field questions. Mayor Colella asked about "bills that were paid by the Village for other people," and Coleman assured the Mayor that there was no finding that the Village paid money owed by anyone else:

Let me correct that. I said that those bills were invoiced to and addressed to somebody else ... But I did not say that those bills were necessarily somebody else's bills, and I don't want to leave anybody with the impression that we've come to that conclusion. In fact, it has been indicated to us that the error was that the bills were not sent back to the vendors and the vendors, had they been sent back, would have corrected them and appropriately sent them to the Village of Endicott. We are not in a position to pass judgment one way or

the other on that, but the record to us is clear that those bills are not in the name of the Village and therefore we have treated them as a question of costs.

Representatives of the Press & Sun–Bulletin and News Channel 34 witnessed these comments.

Karedes' claims are based on two reports concerning the audit published shortly after it was released: (i) a February 25, 2001 Press & Sun–Bulletin article, entitled "Taxpayers footed B.C. Open bills"; and (ii) a February 13, 2001 News Channel 34 broadcast.

At a Board meeting on February 26, 2001, one Trustee cited the "results of [the] Piaker and Lyons audit and what I read in the Sunday edition of the Press and Sun Bulletin" and, based on those sources, made a motion to fire Karedes. Karedes' contract was terminated in March 2001 without further deliberation, and Karedes (he further alleges) was "subject to public ridicule and scorn following his termination."

Karedes filed suit in September 2001. The Press & Sun–Bulletin moved to dismiss pursuant to Rule 12(b)(6), and News Channel 34 moved for judgment on the pleadings pursuant to Rule 12(c). The district court granted both motions, ruling (insofar as is relevant to this appeal): (i) that the February 25, 2001 article was neither capable of defamatory meaning nor false, and (alternatively) was protected as a privileged publication under New York Civil Rights Law Section 74, *see Karedes v. Village of Endicott*, 254 F.Supp.2d 276 (N.D.N.Y.2003); and (ii) that the February 13, 2001 broadcast was neither capable of defamatory meaning nor false, *see Karedes v. Village of Endicott*, 2004 WL 1683146 (N.D.N.Y. Mar. 22, 2004), 2004 U.S. Dist. LEXIS 11338.

## DISCUSSION

"We apply a *de novo* standard of review to the grant of a motion to dismiss on the pleadings, accepting as true the complaint's factual allegations and drawing all inferences in the plaintiff's favor." *DeMuria v. Hawkes,* 328 F.3d 704, 706 (2d Cir. 2003); *see also Tarshis v. Riese Org.,* 211 F.3d 30, 35 (2d Cir.2000). "The test for evaluating a [motion for judgment on the pleadings] is the same as that applicable to a motion to dismiss under Fed. R. Civ. Proc. 12(b)(6)." *Irish Lesbian & Gay Org. v. Giuliani,* 143 F.3d 638, 644 (2d Cir. 1998); *see also DeMuria,* 328 F.3d at 706 n. 1. Because we conclude that Karedes has alleged facts that would permit a reasonable jury to find the elements of defamation under New York law with respect to both the February 25, 2001 article and the February 13, 2001 broadcast, we vacate the judgment.

### I

■ "The gravamen of an action alleging defamation is an injury to reputation. The New York Court of Appeals has defined a defamatory statement as one that exposes an individual 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or ... induces an evil opinion of one in the minds of right-thinking persons, and ... deprives one of ... confidence and friendly intercourse in society.'" *Celle v. Filipino Reporter Enters.,* 209 F.3d 163, 177 (2d Cir.2000) (quoting *Kimmerle v. N.Y. Evening Journal,* 262 N.Y. 99, 186 N.E. 217, 218 (1933)); *see also* Robert D. Sack, *Sack on Defamation* § 2.4.1 (3d ed.2005).

■ For purposes of this appeal, Karedes concedes that he was a "public figure" and that the relevant publications "addressed matters of public concern." A public figure claiming defamation under New York law must establish that "the statements ... complain[ed] of were (1) of and concerning [the plaintiff], (2) likely to be understood as defamatory by the ordinary person, (3) false, and (4) published with actual malice." *Church of Scientology Int'l v. Behar,* 238 F.3d 168, 173 (2d Cir.2001).

■ "Of these inquiries, the first two should ordinarily be resolved at the pleading stage, while resolution of the falsity and actual malice inquiries typically requires discovery." *Id.; see also Celle,* 209 F.3d at 177 (" 'Whether particular words are defamatory presents a legal question to be resolved by the courts in the first instance.' ") (quoting *Aronson v. Wiersma,* 65 N.Y.2d 592, 493 N.Y.S.2d 1006, 483 N.E.2d 1138, 1139 (1985)). However, where the words can be construed as having more than one meaning, only some of which are potentially defamatory, it is for a jury to select among those meanings:

> If the words are reasonably susceptible of multiple meanings, some of which are not defamatory, it is then for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood.

*Celle,* 209 F.3d at 178 (internal quotation marks omitted); *see also Hatfill v. N.Y. Times Co.,* 416 F.3d 320 (4th Cir. July 28, 2005), 2005 U.S.App. LEXIS 15471, at *22, *28 (article defamatory where it "fairly can be read" by "a reasonable reader" as imputing to the plaintiff the commission of a crime).

"The New York Court of Appeals has developed standards that federal courts follow in determining whether a statement or publication is defamatory," *Celle,* 209 F.3d at 177:

> First, the Court of Appeals has repeatedly instructed that courts must

give the disputed language a fair reading in the context of the *publication as a whole*. Challenged statements are not to be read in isolation, but must be perused as the average reader would against the whole apparent scope and intent of the writing.

Second, courts are not to strain to interpret such writings in their mildest and most inoffensive sense to hold them non-libelous. A fair reading controls.

Finally, the words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood *by the public to which they are addressed*. It is the meaning reasonably attributable to the intended reader that controls.

*Id.* at 177–78 (internal citations and quotation marks omitted).

■■ As to falsity, "[t]he accuracy of the report should be assessed on the publication as a whole, not isolated portions of it," and a "defendant is held only to a standard of substantial, not literal, accuracy." *Law Firm of Daniel P. Foster, P.C. v. Turner Broadcasting Sys., Inc.,* 844 F.2d 955, 959 (2d Cir.1988); *Ingber v. Lagarenne,* 299 A.D.2d 608, 750 N.Y.S.2d 172, 174 (3d Dep't 2002) ("As a defense, truth need not be established to an extreme literal degree. Provided that the defamatory material on which the action is based is substantially true (minor inaccuracies are acceptable), the claim to recover damages . . . must fail.") (internal quotation marks omitted); Sack, *supra,* § 3.7, at 3–16–3–17 ("[T]he question is whether the statement sued upon is 'substantially true.' "). Moreover, "a public figure plaintiff or private figure plaintiff involved in a matter of public concern has the burden to establish falsity." *Law Firm of Daniel P. Foster, P.C.,* 844 F.2d at 959 n. 5 (internal citations omitted); *see also Celle,* 209 F.3d at 181 ("A public figure seeking recovery

in a libel action against a media defendant must establish the falsity of the defamatory statements.").

■■ As to actual malice:

Despite its name, the actual malice standard does not measure malice in the sense of ill will or animosity, but instead the speaker's subjective doubts about the truth of the publication. If it cannot be shown that the defendant knew that the statements were false, a plaintiff must demonstrate that the defendant made the statements with reckless disregard of whether they were true or false. The reckless conduct needed to show actual malice is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing, but by whether there is sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.

*Church of Scientology,* 238 F.3d at 174; *see also Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 510, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) ("Actual malice . . . should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will."); Sack, *supra,* § 5.5.1.1, at 5–68 (actual malice "relates to whether the defendant published without believing the truth of the publication").

■ The actual malice showing "must be made with 'convincing clarity,' or, in a later formulation, by 'clear and convincing proof.' " *Phila. Newspapers v. Hepps,* 475 U.S. 767, 773, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (internal citations omitted). The Supreme Court has identified several factors as relevant to a finding of actual malice:

(1) whether a story is fabricated or is based wholly on an unverified, anonymous source, (2) whether the defen-

dant's allegations are so inherently improbable that only a reckless person would have put them in circulation, or (3) whether there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*Church of Scientology*, 238 F.3d at 174 (citing *St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)); *see also Celle*, 209 F.3d at 183 ("Actual malice can be established through the defendant's own actions or statements, the dubious nature of his sources, [and] the inherent improbability of the story [among] other circumstantial evidence.") (internal quotation marks omitted) (alterations in original); Sack, *supra*, § 5.5.2.1.

## II

On February 25, 2001, the Press & Sun–Bulletin reported the results of the Golf Club audit in a front-page story headlined "Taxpayers footed B.C. Open bills." The salient passages of that article are set out at the length necessary to reflect the legally significant context, with emphasis supplied for the passages Karedes specifically cites as libelous.[1]

A prominent sidebar outlines "**How Endicott picked up the tab**," with photographs of Karedes, Alexander, and the Golf Club, and bills addressed to the BCCC that were paid by the Village at Karedes' direction (with passages projected and blown up). The sidebar calculates that "[t]**he 14 vouchers Karedes authorized and the village paid cost each man,** woman and child in Endicott roughly $12.76." Next to Karedes' photograph is a squib giving his role: "**Some of the vouchers [Karedes] signs are for bills addressed to the B.C. Open for work that auditors said was supposed to be done by [BCCC].**"

The body of the article, running along the sidebar and onto two inside pages, states that the Golf Club renovations should "not [have] cost taxpayers a dime," but did:

**Now auditors estimate the village shouldered more than $170,000 of the cost.** It paid to rent backhoes and plant grass. It signed checks to contractors who were pouring concrete and others who were delivering gravel, even though many of the bills were addressed to [BCCC], which runs the B.C. Open and had agreed to fund the work.

Why Endicott paid the bills is unclear. Former officials say the payments were authorized by village lawmakers; others insist they should never have been paid in the first place. The village's records are so sloppy that neither side can say for certain which of them is right.

But how the village paid bills addressed to someone else is no mystery. **John Karedes,** who has a management consultant agreement with the village to run its golf course, **signed voucher after voucher that effectively passed the cost on to taxpayers.** Two of the bills he signed away were addressed to the man who runs [BCCC], Alex Alexander.

---

1. Karedes alleges that the headline is independently libelous regardless of whether the content of the article is itself libelous. *See, e.g., Seldon v. Shanken*, 143 A.D.2d 3, 531 N.Y.S.2d 264, 266 (1st Dep't 1988) (headlines may be independently defamatory, where not "a fair index of the matter to which they refer[ ]"); *Schermerhorn v. Rosenberg*, 73 A.D.2d 276, 426 N.Y.S.2d 274, 283 (2d Dep't 1980) (defamatory headlines are "actionable though the matter following is not," unless they "fairly indicate the substance of the matter to which they refer" and "are a fair index of the matter contained in a truthful report") (internal quotation marks omitted). Since Karedes conceded below "that the headline fairly indicated the substance of the matter of the article," *Karedes*, 254 F.Supp.2d at 293, the headline argument adds little.

In the last two years alone, Karedes signed more than a dozen vouchers that prompted the village to pay at least $151,676.47 worth of bills addressed to the B.C. Open, a review of Endicott's financial records shows.

Village officials had countless chances to step in and stop the bills from being paid. But a stack of cashed checks and signed invoices shows that they didn't.

The newspaper gave Karedes an opportunity to comment, but he did not help himself much: "Could it have been done better? There were obviously some system problems, and I'm sure improvements could be made.... But those are system problems. It's not just me and it's not just the golf course." However, the article observes that:

What the audit does not say is that the common thread among many of what it called the golf course's most serious problems is Karedes' signature. He is the one who asked the village to pay bills addressed to the B.C. Open and never sought bids to keep the cost down, records show.

The article further reports that the Press & Sun–Bulletin had "examined dozens of bills, vouchers and checks that were singled out by accountants at the [auditing] firm," and turned up the following:

On one day in May 1999 ... Karedes signed away more than $35,000 in bills addressed to the B.C. Open. One of the bills ... was for excavating the 18th fairway—work [BCCC] promised to do with its own money when it inked its deal to buff the En–Joie Golf Course.... **That month, Karedes passed along almost $70,000 in bills addressed to the B.C. Open....**

[I]n late May and early June of 1998, Karedes signed $27,000 worth of bills ... with Alexander's name on them. Village tax-payers paid those bills, too.

**Taxpayers paid again in June 1999,** when in one day, Karedes signed a pair of B.C. Open bills .... [including one bill] for seeding grass, **work auditors said should have been paid for by [BCCC]. But again, taxpayers were left to pick up the tab**.

The article reported on Karedes' account of what happened:

Karedes would not discuss the specifics of the invoices he signed over to the village. But he said much of the work he agreed to pay for was done at the behest of village officials, including former Mayor David Archer, who viewed BCCC's work on the golf course as a good opportunity to finish some of the village's own sought-after renovations.

Karedes said it is possible that the contractors, all of whom also were doing work for [BCCC], addressed invoices meant for the village to the B.C. Open by mistake.

. . .

If there were questions about bills he signed, Karedes said, they should have been brought to him by Kilbury, whose job it was to review the vouchers and invoices he billed to the village. All of the payments had to be approved by Kilbury's department and by the Board of Trustees before the village put a check in the mail.

"No checks were written by me," Karedes said. "I followed the procedures that were given to me in 1996. If I knew a bill was the village's, that's what I paid. We looked at the job description to see who the work should have been charged to."

He admitted, though, that he never asked Endicott's attorney or anyone else in the Municipal Building to clarify what work, if any, he should pay for and what

work had to be funded by [BCCC] under its 1996 contract with the village.

The district court dismissed Karedes' libel claim against the Press & Sun–Bulletin, citing Karedes' admission that he "signed vouchers which were addressed to third-party entities and passed these vouchers along to the Village for payment" and concluding that the article "is not reasonably susceptible to a defamatory meaning" because "what it says is true." *Karedes v. Endicott*, 254 F.Supp.2d at 289. We conclude that this ruling was error.

## A. Defamatory meaning

■ The February 25, 2001 article can be read to say that Karedes arranged for the Village to pay expenses that the Village incurred but that were reflected in invoices erroneously directed for payment by BCCC. Even so, this reading would suggest that Karedes conducted his official duties in a casual and irregular way that exposed him to just criticism by the Village's outside auditors and exposed the Village itself to controversy and scandal. This reading would tend to impair Karedes' reputation, and might cause him to lose his job. But (as the district court ruled), all that was true.

However, there is another fair reading of the article as a whole: that the audit found Karedes responsible for arranging for the Village to pay expenses that were the obligation of BCCC. The headline of the audit story is "Taxpayers footed B.C. Open bills," which conveys an initial impression to the public that the Village made gratuitous payments. The same impression is conveyed by the sidebar undertaking to explain "How Endicott picked up the tab," and it is reinforced elsewhere in the text:

Despite the golf course's pledge that the renovations "would not cost taxpayers a dime," "auditors estimate the village shouldered more than $170,000 of the cost."

According to the story, the audit assigned some or all of the responsibility to Karedes:

"Karedes ... signed voucher after voucher that effectively passed the cost on to taxpayers."

"The 14 vouchers Karedes authorized and the village paid cost each man, woman and child in Endicott roughly $12.76."

"Some of the vouchers [Karedes] signs are for bills addressed to the B.C. Open for work that auditors said was supposed to be done by [BCCC]."

Karedes signed bills for seeding grass, "work auditors said should have been paid for by [BCCC]. But again, village taxpayers were left to pick up the tab."

These passages (and others), in the context of a well-publicized scandal regarding the misappropriation of public funds and the Mayor's challenges to Karedes' conduct, may be said to have exposed Karedes to "public hatred, shame, obloquy, contumely, [and] odium." *Celle*, 209 F.3d at 177. In particular, Karedes alleges a causal link between the February 25, 2001 article and the termination of his contract with the Village, as well as instances of "public ridicule and scorn."

The article's defamatory tendency is not wholly offset by the giving of Karedes' side of the story. Karedes' denials and explanations may blunt, but do not correct, the statement that is arguably made and that may be untrue: that one finding of an independent audit commissioned by the Village was that Karedes caused the Village to pay large sums on behalf of a private interest. *See Celle*, 209 F.3d at 178 ("If the words are reasonably susceptible of multiple meanings, some of which are not defamatory, it is then for the trier of fact, not for the court acting on the issue

solely as a matter of law, to determine in what sense the words were used and understood.") (internal quotation marks omitted).

## B. Falsity

■ A reasonable jury could likewise conclude that the February 25, 2001 article was false. The auditors did not find that Karedes caused the Village to pay for the BCCC's expenses. Though that inference could be drawn by a reader of the text, it was expressly disclaimed by the auditor in the press conference that (it is alleged) was attended by the Press & Sun–Bulletin.

The text of the audit references an agreement for BCCC to pay for improvements at the golf course and recites that, "[p]ursuant to this agreement, ... [t]he Village was to incur none of the expenditures" (other than engineering costs), without mentioning the funding of additional improvements by the Village. A reporter could therefore logically deduce that the Village suffered loss from, *inter alia,* the following audit findings: (i) "it appears that the Village paid three vendors over $153,000 for invoices billed to [BCCC]"; (ii) invoices from two vendors "were billed to the Village" for work that "is similar to the work indicated on the invoices billed to [BCCC] and paid by the Village"; and (iii) "[t]he Village paid invoices that may not be obligations of the Village." On the other hand, some passages in the audit indicate that some of the work on the Golf Course may have been properly allocable to the Village: (i) "Village officials may wish ... to determine *if* any expenditures were *not* the responsibility of the Village" (emphasis added); and (ii) about $30,000 of the sums paid by the Village were "determined by the Village to be [the] responsibility of the Village."

Karedes is entitled to argue, however, that any such ambiguity was dispelled when Piaker & Lyons representative Kenneth Coleman expressly disclaimed any finding that the Village actually paid for expenses that should have been covered by the BCCC, let alone that Karedes had caused that to happen:

I did not say that those bills were necessarily somebody else's bills, and I don't want to leave anybody with the impression that we've come to that conclusion .... In fact, it has been indicated to us that the error was that the bills were not sent back to the vendors and the vendors, had they been sent back, would have corrected them and appropriately sent them to the Village of Endicott.

The complaint sets out Coleman's disclaimer and alleges that the Press & Sun–Bulletin witnessed that disclaimer. The Press & Sun–Bulletin do not contend that the audit and the disclaimer (taken together) were too technical or too subtle to be understood by a reasonable reporter, or that the disclaimer was not part of the audit, or should be discounted or disregarded for some other reason.

"[T]he falsity ... inquir[y] typically requires discovery." *Church of Scientology,* 238 F.3d at 173. On this record, it was error for the district court to rule as a matter of law that the February 25, 2001 article was truthful in reporting the audit as finding that Karedes caused the Village to cover the BCCC's expenses. *See Celle,* 209 F.3d at 189 ("[A] reasonable juror evaluating the evidence could find—by both a preponderance of the evidence and by clear and convincing proof—that those statements were false."); *Turner Broadcasting,* 844 F.2d at 959.

## C. Actual malice

The Press & Sun–Bulletin argues in a conclusory way that Karedes has inadequately pled actual malice. However, "the ... actual malice inquir[y] typically re-

quires discovery." *Church of Scientology,* 238 F.3d at 173. Given that opportunity, Karedes may be able to adduce facts establishing "the speaker's subjective doubts about the truth of the publication." *Id.* at 174. In any event, the district court made no ruling on this issue, and we decline to consider it in the first instance.

## D. New York Civil Rights Law Section 74

The Press & Sun–Bulletin further raises New York Civil Rights Law Section 74 as a legal bar to Karedes' claim. Section 74 provides:

> A civil action cannot be maintained against any person, firm or corporation, for the publication of a *fair and true report* of any judicial proceeding, legislative proceeding or *other official proceeding,* or for any heading of the report which is a fair and true headnote of the statement published.

N.Y. Civ. Rights Law § 74 (emphasis added).

 A publication is deemed "fair and true" if it is "substantially accurate." *Glendora v. Gannett Suburban Newspapers,* 201 A.D.2d 620, 608 N.Y.S.2d 239, 240 (2d Dep't 1994); *see also Calvin Klein Trademark Trust v. Wachner,* 129 F.Supp.2d 248, 253 (E.D.N.Y.2001) ("A report may be considered 'fair and true' under Section 74 if its substance is substantially accurate.") (citing *Holy Spirit Ass'n v. N.Y. Times Co.,* 49 N.Y.2d 63, 67, 424 N.Y.S.2d 165, 399 N.E.2d 1185 (1979)). "A report is 'substantially accurate' if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth." *Zerman v. Sullivan & Cromwell,* 677 F.Supp. 1316, 1322 (S.D.N.Y.1988) (citing *Gurda v. Orange County Publ'ns Div.,* 56 N.Y.2d 705, 451 N.Y.S.2d 724, 436 N.E.2d 1326 (1982)). "A report cannot be said to be 'substantially accurate,' however, if it would have a 'different effect' on the mind of the recipient than the 'actual truth.' In other words, Section 74 does not afford protection if the specific statements at issue, considered in their context, 'suggest[ ] more serious conduct than that actually suggested in the official proceeding.'" *Calvin Klein Trademark Trust,* 129 F.Supp.2d at 253 (quoting *Daniel Goldreyer, Ltd. v. Van De Wetering,* 217 A.D.2d 434, 630 N.Y.S.2d 18, 22 (1st Dep't 1995)).

 The February 12, 2001 public town meeting was an official proceeding, as Karedes concedes, but Karedes contends that the February 25, 2001 article did not give a "fair and true" account. Just as a reasonable jury could conclude that the February 25, 2001 article falsely reported the content of the audit, a reasonable jury could conclude that the article "suggest[ed] more serious conduct than that actually suggested in the official proceeding." *Cf. Turner Broadcasting,* 844 F.2d at 961 ("verbatim quotation" of FBI agent, balanced by other interviews challenging the legitimacy of the relevant search, deemed "fair and true").

## III

On February 13, 2001, News Channel 34 aired a report covering the release of the Golf Club audit. The salient passages of that broadcast are set out at the length necessary to reflect the legally significant context, with emphasis supplied for the passages Karedes specifically cites as defamatory:

> Steve Craig: The political impact of the recently published En–Joie Golf Course Audit has started to sink in and by some accounts the report has added to Endicott Mayor Michael Colella's case against management.

Jen Maxfield: But, **will the village be able to retain some of the money it is said to have lost?** News 34's Greg Kelly joins us now.

Greg Kelly: Jen, Steve, well here's what's happening right now. Mayor Co-lella has said that the village of Endicott could stand to recoup about a million dollars once all the facts are in. Right now the fingers up at the village hall are pointing at two figures in this case, John Karedes, manager of the En–Joie golf course and the Broome County Community Charities organization. They are the sponsors of the B.C. Open. They are responsible for upgrading the golf course to PGA Standards. Well, apparently, they were supposed to have paid for that entirely on their own, but **according to the audit that came out earlier this week they were actually charging the village through John Karedes for expenses that they should have been making on their own.**

. . .

Reaction from Alex Alexander, the Executive Director of the Broome Community Charities was swift and to the point. Although he wouldn't appear on camera, in a written statement he said the following, "Our records indicate that the BC Open fully paid for all the work that it contracted for at the golf course. I don't know what the audit is talking about. I was never contacted by the auditors. Auditors never asked the BC Open about finances."

. . .

Well, is the Village actually going to be able to recoup some of this money? It is really hard to say. Now a lot of people up there in Endicott are saying that this is a politically motivated audit. If you paid somebody to get results for you, well, they're going to get those results regardless of the facts. That's

what some people are saying in certain quarters. So it remains to be seen how this all is going to play out. Lee Karedes is suing the village, his son John is suing the village, so it may be up to a judge to determine the validity of the audit.

The segment ended with a report that the audit had reached the hands of the District Attorney and predictions that criminal charges were unlikely or remote:

But, my sense is, we talked to [the District Attorney] today, he's a long way away from initiating any kind of criminal inquiry. Something has been forwarded to them and they're reviewing it. I can't anticipate any kind of criminal inquiry happening.

Karedes challenged: (i) the statement that "according to the audit," BCCC was "actually charging the village through John Karedes for expenses that [BCCC] should have been making on their own"; and (ii) the premise of Maxfield's question: "will the village be able to retain some of the money it is said to have lost[?]" The district court ruled that these passages—taken in context—were accurate and therefore not reasonably susceptible to defamatory meaning. *See Karedes*, 2004 U.S. Dist. LEXIS 11338, at \*12–\*13. We disagree.

### A. Defamatory meaning

A "fair reading" of the excerpts Karedes highlights, "in the context of the publication as a whole," is that *the audit found* that Karedes arranged or permitted the payment by the Village of expenses owed by BCCC and that the Village thereby suffered a considerable loss that may or may not be recouped. *See Celle*, 209 F.3d at 177–78 (this Court will not "strain" to interpret the broadcast "in [its] mildest and most inoffensive sense to hold [it] nonlibelous"). The relevant context in-

volved the ongoing investigation into alleged taxpayer waste and the Mayor's prior criticisms of the Golf Club's operation and of Karedes as its director.

The broadcast did balance its account of the audit by reporting: (i) Alexander's refutation; (ii) Karedes' lawsuit against the Village; (iii) the unlikelihood that the District Attorney would bring charges; and (iv) the view of some people that the audit was a "politically motivated" hit job. However, the effort to balance the reportage does not in this instance render it unreasonable to think that Karedes' reputation would be impaired by the report that an independent audit had branded Karedes as an official who had diverted Village funds to benefit private interests. *See Celle*, 209 F.3d at 178 ("If the words are reasonably susceptible of multiple meanings, some of which are not defamatory, it is then for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood.").

**B. Falsity**

■ As discussed *supra*, Coleman expressly disclaimed any finding that the Village was charged for the BCCC's expenses or that the Village lost money as the result of illegitimate charges. In light of Coleman's clarification, the audit indicated (as relevant for present purposes) no more than that "the Village paid ... for invoices *billed to [BCCC]*" and that "[t]he Village paid invoices that *may not be obligations of the Village*." (emphasis added).

The broadcast reported, however, that "according to the audit" BCCC was "actually charging the village through John Karedes for expenses that they should have been making on their own," and the broadcast questioned whether the Village might ever recover any of the money it lost. A reasonable jury could conclude that in this respect the broadcast was not substantially accurate. *See Celle*, 209 F.3d at 189 ("[A] reasonable juror evaluating the evidence could find—by both a preponderance of the evidence and by clear and convincing proof—that those statements were false."); *Turner Broadcasting*, 844 F.2d at 959.

**C. Actual Malice**

News Channel 34 does not ask this Court to affirm the district court on the alternate ground that Karedes has inadequately pled "actual malice." This is sensible. The district court did not discuss this question, and "the ... actual malice inquir[y] typically requires discovery." *Church of Scientology*, 238 F.3d at 173.[2]

For the foregoing reasons, the judgment of the district court is vacated and the case is remanded for further proceedings consistent with this opinion.

---

**2.** News Channel 34 does argue that "New York CRL § 74 provides an absolute privilege from liability since the broadcast at issue was a fair and true report of the proceedings and the audit." This argument was not discussed by the district court; nor can it be said—as a matter of law and at this stage—that the broadcast was "fair and true."